CAMERON ET AL. *v.* JOHNSON, GOVERNOR OF
MISSISSIPPI, ET AL.

No. 699.   Argued March 5–6, 1968.—Decided April 22, 1968.

612

*Benjamin E. Smith* and *Arthur Kinoy* argued the cause for appellants. With them on the brief were *William M. Kunstler, Morton Stavis* and *Bruce C. Waltzer.*

*Will S. Wells,* Assistant Attorney General of Mississippi, argued the cause for appellees. With him on the brief were *Joe T. Patterson,* Attorney General, and *William A. Allain,* Assistant Attorney General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Appellants brought this action for declaratory and injunctive relief in the District Court for the Southern District of Mississippi. They sought a judgment declaring that the Mississippi Anti-Picketing Law [1] is an overly

---

[1] The statute as amended is codified as Miss. Code Ann. § 2318.5 (Supp. 1966), and in pertinent part provides:

"1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises, State property, county or municipal courthouses, city halls, office buildings, jails, or other public buildings or property owned by the State of Mississippi, or any county or municipal government located therein, or with the transaction of public business or administration of justice therein or thereon conducted or so as to obstruct or unreasonably interfere

broad and vague regulation of expression, and therefore void on its face. They also sought a permanent injunction restraining appellees—the Governor and other Mississippi officials—from enforcing the statute in pending or future criminal prosecutions or otherwise, alleging that the then pending prosecutions against them for violating the statute [2] were part of a plan of selective enforcement engaged in by appellees with no expectation of securing convictions, but solely to discourage appellants from picketing to protest racial discrimination in voter registration and to encourage Negro citizens to attempt to register to vote.

A three-judge court initially considered the issues on the amended complaint and answers, and dismissed the complaint "in the exercise of its sound judicial discretion" and "in furtherance of the doctrine of abstention," having concluded "that such extraordinary relief is not due or suggested in this case. . . ." 244 F. Supp. 846, 849. We vacated the dismissal, 381 U. S. 741, and remanded for reconsideration in light of our intervening decision in *Dombrowski* v. *Pfister*, 380 U. S. 479.[3] On remand the three-

---

with free use of public streets, sidewalks, or other public ways adjacent or contiguous thereto.

"2. Any person guilty of violating this act shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than Five Hundred Dollars ($500.00), or imprisoned in jail not more than six (6) months, or both such fine and imprisonment."

[2] All of the prosecutions were removed under 28 U. S. C. § 1443 to the federal courts. Following our opinion in *City of Greenwood* v. *Peacock*, 384 U. S. 808, the cases were remanded to the state courts. *Hartfield* v. *Mississippi*, 363 F. 2d 869. They were subsequently stayed by the District Court and are presently stayed pending our decision on this appeal.

[3] Our *per curiam* stated, 381 U. S. 741–742: "On remand, the District Court should first consider whether 28 U. S. C. § 2283 (1958 ed.) bars a federal injunction in this case, see 380 U. S., at 484, n. 2. If § 2283 is not a bar, the court should then determine whether

judge court [4] conducted an evidentiary hearing and again dismissed, this time with prejudice. 262 F. Supp. 873. We noted probable jurisdiction. 389 U. S. 809. We affirm.

## I.

The Mississippi Anti-Picketing Law was enacted by the Mississippi Legislature and signed by the Governor on April 8, 1964, and became effective immediately. The Forrest County voting registration office is housed in the county courthouse in Hattiesburg. The courthouse is set back a distance from the street and is reached by several paved walks surrounding grass plots and a monument. On January 22, 1964, civil rights organizations fostering increased voter registration of Negro citizens staged a large demonstration on the courthouse site. Thereafter they maintained a picket line on the grounds every day except Sunday from January 23 until May 18, 1964. To facilitate access to the courthouse the sheriff at the outset blocked off with barricades a small "march route" area within the grounds to the right of the main entrance to the courthouse, where the pickets, usually few in number, were allowed to picket until April 9. On April 9, the day following the enactment of the Anti-Picketing Law, the sheriff accompanied by other county

---

relief is proper in light of the criteria set forth in *Dombrowski*." The District Court held that § 2283 prohibited the court from enjoining or abating the criminal prosecutions initiated against the appellants prior to the filing of the suit on April 13, 1964, and further, that 42 U. S. C. § 1983 creates no exception to § 2283. 262 F. Supp. 873, 878. We find it unnecessary to resolve either question and intimate no view whatever upon the correctness of the holding of the District Court.

[4] The three-judge District Court which rendered the initial decision consisted of Circuit Judge Rives and District Court Judges Mize and Cox. Upon the death of Judge Mize, Circuit Judge Coleman was designated to serve in his stead. Circuit Judge Rives dissented from his colleagues on both occasions. See 244 F. Supp., at 856, 262 F. Supp., at 881.

officials, read the new law to the pickets at the "march route" and directed them to disperse, which they did. The sheriff also removed the barricades marking the "march route." On the morning of April 10, the pickets, now increased to 35 or 40 persons, appeared at the courthouse and resumed picketing along the now unmarked "march route." The pickets were arrested and formally charged with violation of the Anti-Picketing statute. Others were arrested that afternoon. Seven more pickets were arrested and charged on the morning of April 11. The complaint in this action was filed April 13. Picketing nonetheless continued on the "march route" every day until May 18, but no further arrests were made until May 18, when nine pickets were arrested and charged. All picketing stopped thereafter.

## II.

The District Court's response on the remand to reconsider the case in light of *Dombrowski* was first to render a declaratory judgment, cf. *Zwickler* v. *Koota,* 389 U. S. 241,[5] that the statute was not void on its face, rejecting appellants' contention that it is so broad, vague, indefinite, and lacking in definitely ascertainable standards as to be unconstitutional on its face. We agree with the District Court.

Appellants advance a two-pronged argument. First, they argue that the statute forbids picketing in terms

[5] In the initial decision the District Court declined to pass on the statute's constitutionality, holding that the case was one for abstention. 244 F. Supp., at 855–856. In *Zwickler* we held that it was error in the absence of special circumstances to abstain and refuse to render a declaratory judgment and, further, said, at 254: "a request for a declaratory judgment that a state statute is overbroad on its face must be considered independently of any request for injunctive relief against the enforcement of that statute. We hold that a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction."

"so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally* v. *General Construction Co.*, 269 U. S. 385, 391.[6]  But the statute prohibits only "picketing . . . in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . county . . . courthouses . . . ."  The terms "obstruct" and "unreasonably interfere" plainly require no "guess[ing] at [their] meaning."  Appellants focus on the word "unreasonably."[7]  It is a widely used and well understood word and clearly so when juxtaposed with "obstruct" and "interfere."  We conclude that the statute clearly and precisely delineates its reach in words of common understanding.[8]  It is "a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be . . . proscribed." *Edwards* v. *South Carolina*, 372 U. S. 229, 236.

The second prong of appellants' argument is that the statute, even assuming that it is "lacking neither clarity nor precision, is void for 'overbreadth,' that is, that it offends the constitutional principle that 'a govern-

---

[6] See *Ashton* v. *Kentucky*, 384 U. S. 195, 200–201.

[7] The appellants suggest that the amendment to the statute which twice inserts the word "unreasonably" "raises new questions of unconstitutional vagueness and overbreadth not before this Court on the original appeal."  The District Court rejected this argument, 262 F. Supp., at 879: "Plaintiffs . . . argue that the addition of the word 'unreasonably' to the statute made it even more vague and indefinite, but we disagree.  The word 'unreasonable' seems to have been well understood by the founders of the Republic when they used it in the Fourth Amendment, where it remains, and is enforced, as it should be, to this day."  Judge Rives, in dissent, 262 F. Supp., at 897, n. 58, found that the addition of the word to the statute did not alter its scope.  "On the contrary, the defendants argue that the statute should always have been interpreted as if this word were present and that the persons arrested did unreasonably block the Court House."

[8] See *Cameron* v. *Johnson*, 381 U. S., at 749–750 (dissenting opinion of BLACK, J.); *id.*, at 757 (dissenting opinion of WHITE, J.).

mental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Zwickler* v. *Koota, supra,* at 250.[9] The argument centers on the fact that the proscription of the statute embraces picketing employed as a vehicle for constitutionally protected protest. But "picketing and parading [are] subject to regulation 'even though intertwined with expression and association," *Cox* v. *Louisiana,* 379 U. S. 559, 563,[10] and this statute does not prohibit picketing so intertwined unless engaged in in a manner which obstructs or unreasonably interferes with ingress or egress to or from the courthouse. Prohibition of conduct which has this effect does not abridge constitutional liberty "since such activity bears no necessary relationship to the freedom to . . . distribute information or opinion." *Schneider* v. *State,* 308 U. S. 147, 161. The statute is therefore "a valid law dealing with conduct subject to regulation so as to vindicate important interests of society and . . . the fact that free speech is intermingled with such conduct does not bring with it constitutional protection." *Cox* v. *Louisiana, supra,* at 564.

### III.

The District Court's further response on remand to reconsider the case in light of *Dombrowski* was to deny

---

[9] See *NAACP* v. *Alabama,* 377 U. S. 288, 307; see also *Zwickler* v. *Koota,* 389 U. S. 241, 249–250; *Keyishian* v. *Board of Regents,* 385 U. S. 589, 609; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 508–509; *NAACP* v. *Button,* 371 U. S. 415, 438; *Shelton* v. *Tucker,* 364 U. S. 479, 488; *Cantwell* v. *Connecticut,* 310 U. S. 296, 304–307; *Schneider* v. *State,* 308 U. S. 147, 161, 165.

[10] See *Schneider* v. *State,* 308 U. S. 147, 161; *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490, 499–500; *NAACP* v. *Alabama,* 357 U. S. 449, 460–462; *NAACP* v. *Button,* 371 U. S. 415, 438–439.

injunctive relief, after an evidentiary hearing, on findings that appellants failed to show sufficient irreparable injury to justify such relief. Appellants argue in this Court that the record discloses sufficient irreparable injury to entitle them to the injunction sought, even if the statute is constitutional on its face.

*Dombrowski* recognized, 380 U. S., at 483–485, the continuing validity of the maxim that a federal district court should be slow to act "where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court," *Douglas* v. *City of Jeannette,* 319 U. S. 157, 162; see *Zwickler* v. *Koota, supra,* at 253. Federal interference with a State's good-faith administration of its criminal laws "is peculiarly inconsistent with our federal framework" and a showing of "special circumstances" beyond the injury incidental to every proceeding brought lawfully and in good faith is requisite to a finding of irreparable injury sufficient to justify the extraordinary remedy of an injunction. 380 U. S., at 484. We found such "special circumstances" in *Dombrowski.* The prosecutions there begun and threatened were not, as here, for violation of a statute narrowly regulating conduct which is intertwined with expression, but for alleged violations of various sections of excessively broad Louisiana statutes regulating expression itself—the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. These statutes were challenged as overly broad and vague regulations of expression. Despite state court actions quashing arrest warrants and suppressing evidence purportedly seized in enforcing them, Louisiana officials continued to threaten prosecutions of Dombrowski and his co-appellants under them. In that context, we held that a case of "the threat of irreparable injury required by traditional doctrines of equity" was made

out. 380 U. S., at 490. We held further that the sections of the Subversive Activities and Communist Control Law (for alleged violations of which indictments had been obtained while the case was pending in the federal court) were patently unconstitutional on their face, and remanded with direction to frame an appropriate injunction restraining prosecution of the indictments.

In short, we viewed *Dombrowski* to be a case presenting a situation of the "impropriety of [state officials] invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities . . . ." 380 U. S., at 490. In contrast, the District Court expressly found in this case "that there was no harassment, intimidation, or oppression of these complainants in their efforts to exercise their constitutional rights, but they were arrested and they are being prosecuted in good faith for their deliberate violation of that part of the statute which denounces interference with the orderly use of courthouse facilities by all citizens alike." 262 F. Supp., at 876, see also 244 F. Supp., at 848–849. We cannot say from our independent examination of the record that the District Court erred in denying injunctive relief.

Any chilling effect on the picketing as a form of protest and expression that flows from good-faith enforcement of this valid statute would not, of course, constitute that enforcement an impermissible invasion of protected freedoms. *Cox* v. *Louisiana, supra,* at 564. Appellants' case that there are "special circumstances" establishing irreparable injury sufficient to justify federal intervention must therefore come down to the proposition that the statute was enforced against them, not because the Mississippi officials in good faith regarded the picketing as violating the statute, but in bad faith as harassing appellants' exercise of protected expression with no intention of pressing the charges or with no expectation of ob-

taining convictions, knowing that appellants' conduct did not violate the statute. We agree with the District Court that the record does not esablish the bad faith charged. This is therefore not a case in which ". . . a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford [appellants] any protection which they could not secure by prompt trial and appeal pursued to this Court." *Douglas* v. *City of Jeannette, supra,* at 164. We have not hesitated on direct review to strike down applications of constitutional statutes which we have found to be unconstitutionally applied to suppress protected freedoms. See *Cox* v. *Louisiana, supra; Wright* v. *Georgia,* 373 U. S. 284; *Edwards* v. *South Carolina, supra.*

Appellants argue that the adoption of the statute in the context of the picketing at the courthouse, and its immediate enforcement by the arrests on April 10 and 11, provide compelling evidence that the statute was conceived and enforced solely to bring a halt to the picketing. Appellants buttress their argument by characterizing as "indefensible entrapment" the enforcement of the statute on April 10 against picketing conduct which county officials had permitted for almost three months along the "march route" marked out by the officials themselves. This argument necessarily implies the suggestion that had the statute been law when the picketing started in January it would not have been enforced. There is no support whatever in the record for that proposition. The more reasonable inference is that the authorities believed that until enactment of the statute on April 8 they had no choice but to allow the picketing. In any event, upon the adoption of the law, it became the duty of the authorities in good faith to enforce it, and to prosecute for picketing that violated that law. Similarly, insofar as appellants argue that selective enforcement was shown by the failure to arrest

those who were picketing from April 11 to May 18, the short answer is that it is at least as reasonable to infer from the record that the authorities did not regard their conduct in that period as violating the statute. Indeed, the fact that no arrests were made over that five-week period is itself some support for the District Court's rejection of appellants' primary contention that appellees used the statute in bad faith to discourage the pickets from picketing to foster increased voter registration of Negro citizens.

Nor are we persuaded by the argument that, because the evidence adduced at the hearing of the pickets' conduct throughout the period would not be sufficient, in the view of appellants, to sustain convictions on a criminal trial, it was demonstrated that the State had no expectation of securing valid convictions. *Dombrowski* v. *Pfister, supra,* at 490. This argument mistakenly supposes that "special circumstances" justifying injunctive relief appear if it is not shown that the statute was in fact violated. But the question for the District Court was not the guilt or innocence of the persons charged; the question was whether the statute was enforced against them with no expectation of convictions but only to discourage exercise of protected rights. The mere possibility of erroneous application of the statute does not amount "to the irreparable injury necessary to justify a disruption of orderly state proceedings." *Dombrowski* v. *Pfister, supra,* at 485. The issue of guilt or innocence is for the state court at the criminal trial; the State was not required to prove appellants guilty in the federal proceeding to escape the finding that the State had no expectation of securing valid convictions.[11] Appellants say that the picketing was non-

---

[11] See 244 F. Supp., at 849: "[T]his Court indicates nothing as to the guilt or innocence of the plaintiffs . . ."; 262 F. Supp., at 876: "We do not sit in this proceeding to determine the guilt or innocence of the plaintiffs . . . ."

obstructive, but the State claims quite the contrary, and the record is not totally devoid of support for the State's claim.

Appellants argue that selective enforcement was shown by the evidence that subsequent to the arrests of the pickets parades were held in Hattiesburg during which the streets of the downtown area, including the locale of the courthouse, were cordoned off during daytime business hours and the sidewalks were obstructed by crowds of spectators during the parades. But this statute is not aimed at obstructions resulting from parades on the city streets. All that it prohibits is the obstruction of or unreasonable interference with ingress and egress to and from public buildings, including courthouses, and with traffic on the streets or sidewalks adjacent to those buildings. There was no evidence of conduct of that nature at any other place which would have brought the statute into play, let alone evidence that the authorities allowed such conduct without enforcing the statute.                    *Affirmed.*

MR. JUSTICE FORTAS, with whom MR. JUSTICE DOUGLAS joins, dissenting.

In my opinion, *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965), requires that the decision of the court below be reversed.

I agree that the statute in question is not "unconstitutional on its face." But that conclusion is not the end of the matter. *Dombrowski* stands for the proposition that "the abstention doctrine is inappropriate for cases . . . where . . . statutes are justifiably attacked on their face as abridging free expression, *or as applied for the purpose of discouraging protected activities."* 380 U. S., at 489–490. (Emphasis added.)

*Dombrowski* establishes that the federal courts will grant relief when "defense of the State's criminal prosecution will not assure adequate vindication" of First

Amendment rights. 380 U. S., at 485. According to *Dombrowski,* this condition exists when the State has invoked the criminal law in bad faith and for the purpose of harassing and disrupting the exercise of those rights. Federal courts are available to enjoin the invocation of state criminal process when that process is abusively invoked "without any hope of ultimate success, but only to discourage" the assertion of constitutionally protected rights. 380 U. S., at 490. See also *City of Greenwood* v. *Peacock,* 384 U. S. 808, 829 (1966).

*Dombrowski* is strong medicine. It involves interposition of federal power at the threshold stage of the administration of state criminal laws. *Dombrowski's* remedy is justified only when First Amendment rights, which are basic to our freedom, are imperiled by calculated, deliberate state assault. And those who seek federal intervention bear a heavy burden to show that the State, in prosecuting them, is not engaged in use of its police power for legitimate ends, but is deliberately invoking it to harass or suppress First Amendment rights. *Dombrowski* should never be invoked when the State is, in substance and truth, engaged in the enforcement of valid criminal laws. Ordinarily, the presumption that the State's motive was law enforcement and not interference with speech or assembly will carry the day.

I approach the problem of the present case with this modest view of *Dombrowski's* scope. Even so, in my judgment, *Dombrowski* commands reversal of the judgment in this case. *Dombrowski* means precious little, I submit, if the presumption supporting state action is not overcome by facts such as those before us now.

On January 22, 1964, civil rights organizations whose members and adherents are represented in this class action by appellants began to picket the Forrest County voting registration office, which is located in the Hattiesburg, Mississippi, courthouse. The picketing was designed to protest racial discrimination in voter registra-

tion and to encourage Negro citizens of the county to register. On that day, there was a large crowd of several hundred persons gathered near the courthouse. The picketing continued from January 22 until May 18, every day except Sunday. After the initial period culminating in the first arrests on April 10, the number of pickets varied from seven to 10.

Shortly after the first day of picketing, the sheriff marked out a "march route." The pickets thereafter confined themselves to this route. They were allowed to continue picketing unmolested. The march route never took the pickets directly in front of any entrance to the courthouse. The picketing was, by all accounts, peaceful and without incident. The pickets at first sang, chanted, preached, and prayed, but within a few days and beginning well before the time of the arrests, they confined themselves to a slow, quiet walk. This continued throughout the relevant dates.

The evidence in this record that the picketing interfered with or even inconvenienced pedestrians is negligible.[1] There is no evidence that access to the courthouse was actually obstructed. If the pickets had been disorderly or had obstructed use of the sidewalks or access to the courthouse, the police, subject to constitutional limitations, could have arrested them under

---

[1] With respect to the arrests made on the morning of April 10, there are some unimpressive shreds of such evidence: the testimony of the home demonstration agent that, in proceeding outside from her office (located in the courthouse) to the office of the county agent (also located in the courthouse), she found that the pickets "were so close together that I had to wait for just a moment to get in line and I fell in line with them and started weaving back and forth until I reached the front steps and then dropped out of the line"; in addition, the president of the Forrest County Board of Supervisors, attracted to the scene by "curiosity as much as anything else," testified that in his "opinion" a side entrance to the courthouse was obstructed by the pickets.

various statutes.[2]   But the record is clear: The pickets confined themselves to the line of march designated by the police themselves, and they were quiet and orderly. They remained at some considerable distance from at least three entrances to the courthouse, including the principal one at the top of the courthouse steps.   There was no reason for their arrest.   They were obeying, not disobeying, the police.

For about two and a half months, from January 22, 1964, to April 10, 1964, the police stood by.   The pickets marched on the prescribed route.   Nobody had any difficulty of passage or of access to the public building.

Then, on April 8, 1964, the Mississippi Legislature enacted a law which, I believe, may fairly be characterized as a directive to the police that the picketing in Hattiesburg should be stopped—forthwith.   This law, as amended, forbade "picketing . . . in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . courthouses . . . ."

The law was signed by the Governor on the same day it was passed by the State Legislature, and delivered by messenger to waiting law enforcement officials in Hattiesburg on the following day.   As soon as the law was brought to those officials on April 9, they read it aloud to the pickets and asked them to disperse.   There was then only a small group of pickets.   The following morning, April 10, when pickets returned to the march route, the first arrests were made.   A large number of persons were picketing on that day, 35 or 40 of them, because they anticipated arrests.   In the same afternoon, only a woman and some school children were picketing.

---

[2] Miss. Code Ann. §§ 2087.5, 2087.9 (1966 Supp.) (disorderly conduct); Miss. Code Ann. § 2089.5 (1966 Supp.) (disturbance of the peace); Miss. Code Ann. § 2090.5 (1957) (disturbance in public place). The record in fact shows that in the early period of picketing some arrests for breach of the peace were made.

All were arrested. On the next day, April 11, nine persons were demonstrating; seven were arrested. The picketing continued every day except Sunday. On May 18, again, there were nine pickets, and all were arrested. There was no further picketing.

Apart from the morning of April 10,[3] at none of the times when arrests were made is there a shred of evidence that the April 8 statute was violated. There is no suggestion that the few pickets present on the afternoon of April 10, on April 11, or on May 18, blocked access to or egress from the courthouse, or obstructed the walks.[4]

I submit that this record compels the following conclusions:

1. The pickets were arrested and prosecuted "without any hope of ultimate success." There is no evidence that their activities "obstruct[ed] . . . or unreasonably interfere[d] with ingress or egress to and from any . . . courthouses . . . ."

The meager, insubstantial evidence of inconvenience to pedestrians, which I have summarized in notes 1 and 4 above, could not be used to support a conviction under the language of this specific, narrowly phrased statute. See *Thompson* v. *Louisville,* 362 U. S. 199 (1960); cf.

---

[3] See n. 1, *supra.*

[4] There were on each of these occasions fewer than 10 pickets walking around a grassy plot on the "march route," a path that measured well over 100 feet in length. There is some indication of a contention that on these occasions the pickets were walking closely bunched. But as Circuit Judge Rives, dissenting in the court below, pointed out, 10 pickets walking closely bunched could not possibly have obstructed any entrance to the courthouse for more than a small fraction of the time necessary to proceed around the plot. And in any event, there is no evidence of anyone having actually been impeded in attempting to gain access to the courthouse on these dates.

*Brown* v. *Louisiana,* 383 U. S. 131 (1966) (opinion of FORTAS, J.). Even if we assume that this record shows that some pedestrians were inconvenienced, that is not the same thing as blocking the doors of the courthouse. I agree that, in an injunctive proceeding like the present action, the State does not have to prove the violation of law beyond a reasonable doubt and establish that it is not constitutionally protected. But, if *Dombrowski* means anything, the State must certainly show more than there is in this record.

2. The arrests and their sequence demonstrate that the State was not here engaged in policing access to the courthouse or even freedom of the sidewalks, but in a deliberate plan to put an end to the voting-rights demonstration. This is shown by the facts (1) that the pickets marched in the line laid out by the police themselves; (2) that the police did not interfere for two and a half months; (3) that the legislature passed a rifle-shot law, neatly directed to this particular situation; (4) that thereupon the police set out to break up the picketing; (5) that the number, volume, and characteristics of the picketing certainly were not more obstructive on the days of the last three arrests than on any other days in which the picketing occurred and was tolerated.

In my opinion, these conclusions demonstrate that the pickets were not arrested as a result of good-faith administration of the criminal law. They were arrested for the purpose of putting a stop to a peaceful, orderly demonstration protected by the First Amendment in principle and in the manner of execution here. They were not arrested because they blocked access to the courthouse. There is powerful evidence in this record that the State cannot possibly anticipate a conviction of the pickets which will withstand the tests this Court has laid down in the First Amendment and Fourteenth

Amendment areas; and it requires more indulgence than this Court has permitted in cases involving First Amendment freedoms for us to say that the State has made a tolerable showing to the contrary.

I would reverse the judgment below and remand for the entry of an appropriate order.[5]

---

[5] In view of the fact that the majority does not reach the issue, I consider it inappropriate to discuss whether the anti-injunction statute, 28 U. S. C. § 2283, constitutes a bar to *Dombrowski* relief in this case. See, however, *City of Greenwood* v. *Peacock*, 384 U. S. 808, 829 (1966).