Burton L. ASCHEIM, Jr., Kenneth P. Boas, Mark Cohen, Robert L. Ruck and Thomas W. Simonds, Plaintiffs,

v.

Francis QUINLAN, Police Officer of the City of Pittsburgh and President of Fort Pitt Lodge No. 1, Fraternal Order of Police, Stephen Joyce, Superintendent of the City of Pittsburgh Police Department, Robert W. Duggan, District Attorney of Allegheny County, et al., Defendants.

Civ. A. No. 70-670.

United States District Court,
W. D. Pennsylvania.

March 19, 1971.

William M. Kunstler, New York City, Harry F. Swanger, Leonard I. Sharon, James H. Logan, Pittsburgh, Pa., for plaintiffs.

Frederick A. Boehm, Pittsburgh, Pa., for defendant, City of Pittsburgh Police Dept.

Anthony V. DeCello, Pittsburgh, Pa., for defendant, Robert W. Duggan, Dist. Atty., of Allegheny County.

OPINION

WEIS, District Judge.

The privilege of free expression has always been cherished by Americans and it is some measure of the priorities which they have assigned to their various liberties that among the rights chosen for inclusion in the very First Amendment of the Constitution and articulated among the earliest clauses of the Bill of Rights are those of freedom of speech and assembly.

We have chosen to follow a philosophy that everyone has a right to express his opinions on the burning issues of the day, be his views ever so unpopular, leaving evaluation of their wisdom to the inexorable judgment of history rather than to an emotional response and repression of the hour. As a corollary, it has seemed only proper to show a corresponding concern for others in the community who may be affected so that as a

generalization we may say that while all are free to speak, no one is forced to listen.

It is against this background of sweeping and broad statement of principles that we are called upon to reach a decision in a specific factual situation where, as in most cases in this Court, the line must be drawn when the rights of one collide with those of another.

The plaintiffs' suit in this Court alleges that there has been an infringement of their First Amendment rights by repressive activities of the Pittsburgh Police Department and various individual members. An injunction is requested to enjoin certain pending criminal prosecutions in the Pennsylvania courts and to prevent future harassment and intimidation by similar use of criminal process.

When the case was originally filed, plaintiffs also sought the convocation of a three-judge Court to consider the constitutionality of certain Pennsylvania Criminal Statutes relating to assault and battery, aggravated assault and battery on a police officer, resisting arrest, the common law crime of inciting to riot,[1] and the City of Pittsburgh ordinance on disorderly conduct. This Court in an opinion by Judge Wallace S. Gourley, 314 F.Supp. 685, denied the petition for a three-judge Court and refused the injunction.

The denial of the three-judge Court was sustained by the Court of Appeals which, however, remanded the proceedings for an evidentiary hearing on the request for an injunction to enjoin the state prosecutions and future harassment. In compliance with this mandate, an extensive hearing was held which required eight trial days and involved the testimony of more than 50 witnesses.

While the plaintiffs' claims were sweeping and evidence was produced to demonstrate examples of claimed police misconduct on numerous occasions, the principal incident involves an occurrence in the "City Court" of Pittsburgh. This is a court of the minor judiciary and although its magistrates are appointed by the Mayor of Pittsburgh, they are part of the unified Judicial System and are subject to control by the Court of Common Pleas of Allegheny County and by the Supreme Court of Pennsylvania.[2]

The stage was set when a number of persons, including the plaintiff Ascheim, were arrested in the early hours of March 19, 1970 on charges of disorderly conduct growing out of a demonstration which had been conducted at about 1:30 A.M. in front of the residence of a draft board member. The picketing was part of a series of planned vigils protesting American participation in the Vietnam War and the operation of the Selective Service System.

The charges were scheduled for hearing in the City Court at about 9:30 A.M. of that same day and as that hour neared, there were seated in the body of the courtroom the other four plaintiffs involved in this case, Cohen, Ruck, Boas and Simonds, along with a number of other young people who were friends of the accused or who supported their activities. While the number of sympathizers present was not clearly established, somewhat more than fifty appears to be an accurate estimate.

The hearing room was not a large one and it was overcrowded. All the seats had been taken and police officers, who had been called because of reports of possible trouble, stood along the two side walls. The defendants at the hearing, their attorneys and the arresting police officers were gathered in a group in front of the magistrate's bench. Standing beside the bench was the assistant superintendent of police and close by were the press reporters. Also in this area in front of the magistrate was an

---

1. An attack on the constitutionality of this offense was made in a suit in the Eastern District of Pennsylvania under a similar type of action. See Heard v. Rizzo, 281 F.Supp. 720 (1968), aff'd. 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358.

2. Pennsylvania Constitution, Article V, Schedule § 21, P.S.

officer named Sachko who was a turn-key at the police station where the court is located and who also doubled as a tip-staff for the magistrate. Separating this group of participants from the spectators was a metal railing about three feet high.

When the defendants were brought into the room from the adjoining cell area, there was applause from their partisans. The magistrate warned that the courtroom would be cleared if any disruption occurred during the course of the hearing. During the taking of testimony, he again made a number of requests for quiet in the room.

The magistrate's admonitions met with some limited response but when the tipstaff-turnkey took hold of Ascheim to compel him to turn to face the magistrate, decorum vanished. Some of the spectators, including the plaintiff Cohen, leaped up in noisy protest and the magistrate gave the order to clear the courtroom. In compliance with this directive, the police had moved most of the spectators through the courtroom door to an anteroom when a general melee broke out involving the officers and those being ejected.

As a result of this fracas, police officers filed various charges against the present plaintiffs including aggravated assault and battery, assault and battery, inciting to riot, and assault on a police officer. The present suit was filed after the preliminary hearings had been held on these criminal charges but before the dates on which the indictments were returned by the Grand Jury.

With this broad outline the parties are generally in agreement. Substantially different versions, however, of the particulars were presented by plaintiffs and defendants.

A number of witnesses called on behalf of the plaintiffs insisted that the tipstaff had viciously pulled Ascheim's long hair in an attempt to turn his head toward the magistrate. They also said that the police had been using insulting and obscene language toward the spectators, many of whom were garbed in informal style and who affected long hair and beards in what might loosely be described as "hippie" style. They claimed that the police had committed completely unprovoked and brutal attacks upon a number of the young people, particularly in the anteroom where most of the violence occurred.

On the other hand, the magistrate and the various policemen who testified painted a picture of a disruptive, disrespectful, unruly and completely uncooperative group of spectators at the hearing. According to this version, the taunting, obscenities and verbal provocations came from the spectators, not from the police and the scuffling in the anteroom was precipitated by the plaintiffs and their friends.

In view of our disposition of this case, it would not be appropriate to make any comments upon the credibility of witnesses or pass upon the responsibility for the courtroom disturbance. It is sufficient to say that the testimony is sharply controverted and if the witnesses appearing on behalf of the police are believed by a jury, there would be enough evidence to sustain a conviction of the present plaintiffs in the state court criminal proceedings.

While it is also true that a jury could decide in favor of the plaintiffs, that is not controlling in the context of this case. It is not the function of this court to decide the guilt or innocence of the participants in the courtroom incident nor indeed is it the burden of the state at this time to prove the guilt of the plaintiffs beyond a reasonable doubt. Once having found that genuine issues of fact exist, a resolution of the conflicting contentions by this Court would be an unwarranted usurpation of the prerogatives of a state court jury.

As a part of their secondary attack that there was a conspiracy and continuing plan to harass them, the plaintiffs produced evidence through a number of witnesses to show what was claimed to be other examples of police violence against those who held unpopular views

with respect to the war, the draft, racial discrimination, and other causes. The contention is made that part of this testimony concerning alleged police excesses, particularly by members of the Police Tactical Force, which was formed and used for riot and crowd control, established a pattern or plan to intimidate those who participated in public demonstrations.

Witnesses were also called by the plaintiffs to show that on some occasions, at least, police efforts to discipline errant members within their ranks were ineffectual and half-hearted, if not nonexistent.

It did appear, however, that most of the incidents of alleged police excesses which occurred during other demonstrations concededly took place not in the prevention of the assemblies but in their regulation and control.

The protest marches and meetings were concerned with a variety of issues including boycotts against grapes and lettuce, opposition to Vice President Agnew on the occasion of his visit to Pittsburgh, objection to the extension of the war into Cambodia, and the Black Coalition's march in support of its demands for employment of black workmen in the construction industry. These incidents occurred both before and after the events which occurred in the City Court on March 19, 1970.

In none of these demonstrations, however, were any of the five plaintiffs arrested or harassed, although Ascheim had been arrested on one other occasion in a disagreement with patrolling officers. In none of these other events were any of the policemen on duty among those who preferred charges in this case. There was no evidence whatsoever of any plan by the police or of any co-operation between the arresting officers in the case at bar and the Tactical Force or of any official directive to carry out any prescribed policy with respect to these five plaintiffs.

The plaintiffs sought to prove that the Tactical Force was unduly harsh with any group whose views it considered sedetious, unpatriotic or nonconformist. However, it is undisputed that not one member of the Police Tactical Force was in the courtroom on March 20, 1970 when the disruption occurred. Most of the officers present were members of the homicide squad or narcotics squad who were in the building fortuitously that morning. Furthermore, none of these officers had had any previous contact with crowd control units or with the plaintiffs, nor is it likely they would have any such association in the future.

Plaintiffs failed to present any testimony whatsoever to show that the prosecuting officers in this case had any knowledge of any other demonstrations in which these particular plaintiffs might have been involved on earlier dates or any which occurred after the City Court incident other than that of the day following which was concerned with the incident itself.

The plaintiffs and a number of their witnesses testified that because of the City Court incident, they have not participated as freely in demonstration activity, that they fear police violence, that they did not feel as free to ask others to participate in public protest programs, and that in recent months mass activities have been smaller than before.

The evidence on this point was conflicting, vague, unimpressive and unconvincing.

Testimony did reveal that there had been a number of protest meetings, parades, and assemblages since March 19, 1970 and that the plaintiffs participated in most of them. Indeed during the course of the hearing in this case plaintiffs requested an early luncheon adjournment one day so that they could join a group protesting the involvement of the United States in Laos. The plaintiffs contended that they were not afraid to participate in that gathering, which was held in front of the Federal Building, because they felt the police would be deterred from exercising any violence by the pendency of this case.

However, the argument cuts just as strongly in the other direction, i. e., that plaintiffs and their sympathizers would conceive it to be in their own best interests to conduct themselves in a peaceable and orderly fashion so as not to prejudice their suit.

Underlying the plaintiffs' theory on this phase of the case seems to be an assumption that the First Amendment grants unlimited discretion as to the means of expressing their views, and that free speech carries with it a privilege to participate in any type of demonstration unfettered by any form of police control.

The law however is to the contrary. As the Supreme Court said in Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471:

"From these decisions certain clear principles emerge. The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

Those who organize large numbers of people to protest or encourage governmental or social policies cannot escape responsibility for regulating the conduct of the assemblage simply by saying that it is planned to be nonviolent. It would be naive indeed to expect that in any large gathering there would not be some small group of people who would delight in disruption, and who would not be unhappy should a confrontation with the police occur.[3]

The defendants did not attempt to meet all of the issues raised by the plaintiffs in this phase of the case but did describe the in-service training program which has recently been instituted by the police department which includes instruction of every member of the force in such matters as crowd control, community relations, etc. Since the testimony was one-sided, we refrain from passing judgment on these collateral matters particularly since counsel for the plaintiffs conceded in his closing summation that this Court is not to act as a Mayor's Commission on Human Relations in reviewing the actions of the police department nor is it to deal with the charges of alleged police brutality per se.

We do observe, nonetheless, that some of the testimony of excessive force by individual police officers on specific oc-

3. Another exposition of proper police activity appears in Feiner v. New York, 340 U.S. 315, 321, 71 S.Ct. 303, 306, 95 L.Ed. 267: "It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace."

casions was quite disturbing and should cause concern in the minds of those officials who have the responsibility of determining the accuracy of such charges and taking appropriate action. While the hearing of this case furnished an opportunity for public airing of many complaints of this nature, they should have been heard, answered, and evaluated long before this time.

Among the defendants named by the plaintiffs was Francis Quinlan, President of the Local Chapter of the Fraternal Order of Police. Allegations were made that this organization was influential in having the individual police officer defendants file criminal charges against the plaintiffs. The completed record, however, contains no support for this contention.

Much trial time was devoted to establishing that Quinlan had made some remarks on a television newscast on the evening of March 20, 1970 requesting public support for the police and condemning the activities of the plaintiffs in the courtroom on that day. Quinlan professed to be unable to remember any of the details of his statement but a videotape portion of the newscast established conclusively that the remarks had indeed been made. While Quinlan's lack of memory was curious, the statements themselves did not establish any more other than that he was exercising his rights to express views which were as unpopular with the plaintiffs as theirs were with him.

It appears that the F.O.P. has no control over the hiring, dismissal or disciplining of policemen but is simply a fraternal organization which does represent the police in their collective bargainings with the City with respect to wages and working conditions. There was no competent evidence to establish that the F. O.P. controls the police department in the discharge of its duties, or that the City Administration has surrendered its authority or responsibility to the fraternal group. No case against Quinlan was proved by the plaintiffs.

For the vindication or protection of civil rights, the law provides a number of remedies but none is more narrowly restricted than the grant of an injunction against state criminal proceedings, pending or threatened.[3a] This is an extraordinary remedy, sparingly applied. It is not every case of police misconduct, it is not every case of abuse of legal process, it is not every case of prosecution founded upon nonexistent grounds nor every case instituted out of improper motivation which qualifies for this exceptional intervention with the legal processes of a state, albeit that the same evidence may furnish grounds for other forms of relief.[4]

The hesitancy of Federal Courts to exercise the power of injunction may be explained in terms of history and national policy. Traditionally, the American people have been opposed to a limitation by a court of equity upon the jury's authority in a criminal proceeding. While in modern times this policy has not been as forcibly expressed as it was in the early days of the Republic, it is nonetheless a continuing, viable concept, most recently finding expression by the Supreme Court of the United States in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, 1971.

The Court there, however, placed more reliance upon "National Policy" which it

---

3a. The anti-injunction statute, 28 U.S.C. § 2283, does not concern us here since in the Third Circuit, the Act is not a bar to equitable jurisdiction in cases of this nature. See Cooper v. Hutchinson, 184 F.2d 119 (3rd Cir. 1950); National Land & Investment Co. v. Spector, 428 F.2d 91 (3rd Cir. 1970). Other circuits are in disagreement but the Supreme Court has yet to resolve the conflict.

4. e. g. Damages may be secured under the provisions of the Civil Rights Act, 42 U. S.C. § 1983 in circumstances where an injunction would not be issued. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965).

labeled "Our Federalism", defining it as:

"A recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. * * * What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."

The Court goes on to say:

"* * * it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions."

*Younger* and the other cases decided on the same day severely curtailed but still left in existence one exception to the broad policy which was set out in the earlier decision of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. The plaintiffs contend that this case establishes their eligibility for the injunctions which they now seek.

Careful analysis of the *Dombrowski* doctrine reveals that in order to qualify the plaintiffs must show that:

1. The prosecutions were instituted in bad faith;

2. without any hope of ultimate success; and

3. were begun for the purpose of deterring plaintiffs in the exercise of their First Amendment rights, so as to amount to irreparable injury.

All of these elements must be shown before the *Dombrowski's* holding is applicable.

In a later case, Cameron v. Johnson, 390 U.S. 611, 621, 88 S.Ct. 1335, 1341, 20 L.Ed.2d 182, the Supreme Court in discussing these requirements said:

"Nor are we persuaded by the argument that, because the evidence adduced at the hearing of the pickets' conduct throughout the period would not be sufficient, in the view of appellants, to sustain convictions on a criminal trial, it was demonstrated that the State had no expectation of securing valid convictions. Dombrowski v. Pfister, supra, 380 U.S. at 490, 85 S. Ct. [1116] at 1122. This argument mistakenly supposes that 'special circumstances' justifying injunctive relief appear if it is not shown that the statute was in fact violated. But the question for the District Court was not the guilt or innocence of the persons charged; the question was whether the statute was enforced against them with no expectation of convictions but only to discourage exercise of protected rights. The mere possibility of erroneous application of the statute does not amount 'to the irreparable injury necessary to justify a disruption of orderly state proceedings.' Dombrowski v. Pfister, supra, 380 U.S. at 485, 85 S.Ct. [1116] at 1120. The issue of guilt or innocence is for the state court at the criminal trial; the State was not required to prove appellants guilty in the federal proceeding to escape the finding that the State had no expectation of securing valid convictions."

Even though dissenting justices in the *Cameron* case believed that an injunction should have been granted and disagreed with the holding of a majority, they did say at page 623, 88 S.Ct. at page 1342:

"*Dombrowski's* remedy is justified only when First Amendment rights, which are basic to our freedom, are imperiled by calculated, deliberate state assault. And those who seek

federal intervention bear a heavy burden to show that the State, in prosecuting them, is not engaged in use of its police power for legitimate ends, but is deliberately invoking it to harass or suppress First Amendment rights. *Dombrowski* should never be invoked when the State is, in substance and truth, engaged in the enforcement of valid criminal laws. Ordinarily, the presumption that the State's motive was law enforcement and not interference with speech or assembly will carry the day."

In the recent *Younger* case, the Supreme Court reviewed *Dombrowski* and while agreeing that in special circumstances it is still applicable, pointed out that:

"In view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is 'both great and immediate.'"

After hearing the testimony of all the witnesses in this case, this Court cannot say that the prosecutions were instituted without any hope of ultimate success.[5] Furthermore, even if it would be found that bad faith was involved on the part of the police and that they had little or no hope of ultimate success, there is no competent evidence in this record to show that the intent was to deter the plaintiffs in the exercise of their First Amendment rights.

■ The decorum of spectators in a courtroom is not a matter of expression of free speech nor is maintenance of order in such a situation a violation of the First Amendment.[6] If First Amendment or any other Constitutional rights are to be preserved, it must be done in the courtrooms under proper circumstances and with proper procedures.

We find specifically that the incident in City Court giving rise to the charges did not arise out of a permissible exercise of free speech nor was there any evidence to establish an intent to restrict exercise of First Amendment rights under legitimate circumstances in the future by these plaintiffs.

Additionally, the plaintiffs have produced no credible evidence to meet their burden of showing that they have or will suffer irreparable injury which is both "great and immediate."

■ In its remand, the Court of Appeals advised the plaintiffs that their burden was a heavy one. The evidence they have produced in this Court fails to meet that requirement. The request for an injunction to enjoin the pending state criminal proceedings must therefore be denied.

The plaintiffs have also asked that an injunction against future harassment include all others "similarly situated." Just who the people might be who fall within this category has not been the subject of definitive proof in this Court.

There was testimony about those who protested against the sale of grapes produced by non-union farm labor in California, about people who were against the sale of lettuce produced by workers other than those in a certain specified union, and about citizens who participated in marches to emphasize the necessity for equal job opportunities and union membership rights for black tradesmen. Still other people were active in asserting opposition to the military actions of the United States in Indo-China and the existence and operation of The Selective Service System.

It is conceivable, and no doubt true, that the people who have grievances against certain lettuce producers need not share the same views regarding the war in Vietnam, nor do those who urge the cause of one union to represent migrant grape pickers necessarily have any common disagreement with the draft laws. Thus no standards of classifica-

---

5. National Land v. Spector, supra.

6. Cox v. Louisiana, supra; Heard v. Rizzo, supra; Zwicker v. Boll, 270 F.Supp. 131 (D.C.1967), Aff'd. 391 U.S. 353, 88 S.Ct. 1666, 20 L.Ed.2d 642.

tion or means of identification of those to be included in the class were developed at the hearing and under these circumstances it would be impossible to fashion any decree with the precision necessary to make it enforcible or understandable.

Also lacking was any evidence to indicate that any of the various groups mentioned had been threatened with or had reason to expect unfounded prosecutions in the future.

In the *Younger* case, in discussing those entitled to be granted an injunction, the Court said:

> "But here appellees Dan, Hirsch, and Broslawsky do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible. They claim the right to bring this suit solely because, in the language of their complaint, they 'feel inhibited.' We do not think this allegation, even if true, is sufficient to bring the equitable jurisdiction of the federal courts into play to enjoin a pending state prosecution. A federal lawsuit to stop a prosecution in a state court is a serious matter. And persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases."

The request for injunction to enjoin future harassment, intimidation, or prosecutions, therefore, must be limited to the five named plaintiffs.[7] However, they have produced no evidence to support a finding that such harassment will occur.

We are well aware that in most circumstances it is difficult to prove an intent to violate the law by questioning defendants who are involved in litigation like that at bar. We recognize that in this situation very wide latitude in the introduction of evidence must be permitted and that inferences from testimony must be utilized realistically. Such recognition of the difficulties the plaintiffs face, however, is not sufficient to justify the Court in indulging in sheer speculation.

 Even in a routine equity proceeding there would not be sufficient evidence to substantiate plaintiffs' allegations about future harassment and a fortiori the burden has not been met in this case where policy considerations play so large a role. The request for injunction to enjoin further harassment must also be denied because of insufficient evidence.

This opinion includes the necessary findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

---

7. See Rollins v. Shannon, D.C., 292 F.Supp. 580, 588.  Cf. Keen v. Long, D.C., 302 F.Supp. 1383.