Orjan **CHOLMAKJIAN**, James Rieben, Regina McKewin, Marilyn Jones, Beth Shapiro, Joseph Hanna, William Derman, Al Hurwitz, and Kent Frid, and Action Group To Combat Racism, individually and on behalf of others similarly situated, Plaintiffs,

v.

**BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY**, Clifton R. Wharton, Jr., Raymond Scodeller, Richard E. Bernitt, Glen Perry and Jack Ostrander, individually and in their official capacities, as well as their Agents, Assistants, Successors, Employees, Attorneys and All Other Persons Acting in Concert or Cooperation With Them, Defendants.

Civ. A. No. 6348.

United States District Court,
W. D. Michigan, S. D.

Aug. 12, 1970.

Lafferty, Reosti, Jabara, Paphakian, James, Stickgold & Smith, Goodman, Eden, Robb, Millender, Goodman & Bedrosian, Detroit, Mich., Marc Stickgold, Paul Rosen, James Short, Detroit, Mich., of counsel, for plaintiffs.

Anderson, Carr & Street, Lansing, Mich., Leland W. Carr, Jr., Lansing, Mich., of counsel, for Bd. of Trustees of Michigan State University, Clifton R. Wharton, Jr., Richard E. Bernitt and Jack Ostrander.

Michael G. Harrison, Lansing, Mich., for Kenneth L. Preadmore.

Oskar M. Hornback, City Atty., Lansing, Mich., for Derosd Husby.

James R. Ramsey and Thomas Rasmussen, Lansing, Mich., for Raymond L. Scodeller.

Frank J. Kelley, Atty. Gen., by William J. Mullaney, Asst. Atty. Gen., Detroit, Mich., for Glen Perry.

Dennis E. McGinty, East Lansing City Attorney, East Lansing, Mich., for Charles F. Pegg.

## OPINION

FOX, District Judge.

Plaintiffs in this civil rights class action are students and faculty members at Michigan State University. Their complaint results from mass arrests carried out in the early morning hours of May 19, 1970, at the Michigan State University Student Union. Defendants include the Board of Trustees of Michigan State University, University President Clifton R. Wharton, Jr., Ingham County Prosecutor Raymond Scodeller, Michigan State University Director of Public Safety Richard E. Bernitt, Michigan State Po-

lice Officer Glen Perry, and Union Assistant Manager Jack Ostrander.[1]

Those arrested were subsequently charged with violation of both the Michigan trespass statute and a Michigan State University ordinance.[2]

Trials on these charges were scheduled to begin in state court in July of 1970. Plaintiffs have brought this action seeking declaratory and injunctive relief to prevent these prosecutions. They allege:

(1) That the actions of police and university officials were not carried out to vindicate valid state interests but were instituted solely for the purpose of discouraging the exercise of first amendment rights, and

(2) That the Michigan State University ordinance is both vague and overbroad, and thus unconstitutional on its face.

Federal jurisdiction is established under the Civil Rights Act, 42 U.S.C. § 1983, and under 28 U.S.C. §§ 1343(3), 1343(4), 2201 and 2202. Plaintiffs filed this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, as representatives of all those arrested on May 19, and also on behalf of persons who have allegedly been intimidated by the measures taken that evening.

A pre-hearing telephone conference between the court and prosecuting officials of Ingham County, in the presence of plaintiffs' counsel, resulted in an arrangement whereby the municipal judge and the prosecuting officials agreed to withhold state action pending resolution of the instant case in the federal district court.

Defendant Perry moved for dismissal on the pleadings pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure. Defendants Trustees, Wharton, Bernitt and Ostrander moved for summary judgment under Rule 56. The court denies both motions.

■ It is clear that plaintiffs' complaint states a cause of action, cognizable in federal court, and it certainly cannot be said, upon examination of the pleadings alone, that they will be unable to factually support their allegations.

"A civil complaint asserting such an abuse of prosecutorial function would state a claim under the Civil Rights Act, 42 USC § 1983 and justify injunctive relief, Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22." Cox v. Louisiana, 348 F.2d 750 (5 Cir. 1965).

After taking testimony the court concludes that there is a genuine issue of fact presented in this case.

Defendant Perry has also contended that this court should not proceed unless

---

1. Defendants Tegg, Preadmore and Husby were dismissed from this case upon stipulation by the parties that members of the Lansing and East Lansing Police Departments, and Ingham County Sheriff's Office were not involved in the actual arrests on May 19.

2. The trespass statute, 750 M.C.L.A. 552, reads as follows:
   "750.552 Trespass upon lands or premises of another; penalty
   Sec. 552. Any person who shall wilfully enter, upon the lands or premises of another without lawful authority, after having been forbidden so to do by the owner or occupant, agent or servant of the owner or occupant, or any person being upon the land or premises of another, upon being notified to depart therefrom by the owner or occupant,

the agent or servant of either, who without lawful authority neglects or refuses to depart therefrom, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by imprisonment in the county jail for not more than 30 days or by a fine of not more than $50.00, or both, in the discretion of the court. P.A.1931, No. 328, § 552, added by P.A.1951, No. 102, § 1, Imd. Eff. May 31, 1951."
   The Michigan State University ordinance states:
   "No person shall loiter or trespass in any building, construction area, building under construction, street, tunnel, restrooms or sleeping room areas of the opposite sex, or area where he is not assigned for living, work, organized recreation or study purposes."
   :

constituted as a three-judge court under 28 U.S.C. § 2281:

"An interlocutory or permanent injuction restraining the enforcement, operation, or execution of any state statute * * * shall not be granted by any district court * * * upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

Since plaintiffs have never challenged the constitutionality of the trespass statute, but claim only an unconstitutional result from a specific application thereof, a three-judge panel is unnecessary for adjudication of this aspect of their complaint. Bartlett & Co., Grain v. State Corp. Comm., 223 F.Supp. 975 (D.C.Kan.1963), Evergreen Review, Inc. v. Cahn, 230 F.Supp. 498 (D.C.N.Y. 1964), Maison v. Confederated Tribes, 314 F.2d 169, cert. den. 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 60 (9th Cir. 1963).

"A three-judge court is to be invoked only where the complaint seeks injunctive relief, and is not necessary if the constitutionality of a statute is drawn in question without any prayer for the restraint of its enforcement. The special court is required only if the injunction is sought on federal constitutional grounds. *Like many things about 'this deceptively simple statute,' this limitation abounds with slippery distinctions.* Thus *three judges are needed* if it is claimed that the *statute, as applied to plaintiff, is unconstitutional, even though* it may be *conceded* that the *statute in general is valid. But* a different result is reached, and *three judges* are *not required, if* it is *possible to enjoin state officials without holding a state statute or administrative order unconstitutional, as where it is claimed that the officials are administering a constitutional statute in an unconstitutional manner.* Nor are three judges required if the claim is that a state statute conflicts with a federal statute that, by virtue of the Supremacy Clause, is controlling." (Emphasis supplied.) "The Three-Judge Court Acts," Charles Alan Wright, Law of Federal Courts § 50 (2d ed. 1970), page 189.

With respect to the Michigan State University ordinance, this court could at least proceed to take testimony on either of two bases. First, the term "statute" in § 2281 does not include "local ordinances." Ellis v. Mayor and City Council of Baltimore, 352 F.2d 123 (4th Cir. 1965). The court may proceed on the basis that this loitering provision is of such local character and limited application as to fit within that category of provisions for which a constitutional attack does not require the dignity of a three-judge court. If it should be found that the nature of the ordinance is not essentially local, the court then, on a more solid basis, may refer the matter to a three-judge panel. Second, convening a three-judge court requires the presence of substantial constitutional questions. A single judge is entitled to take some testimony in aid of an accurate determination of this threshold requirement. Swift and Co. v. Wickham, 382 U.S. 111, 15 L.Ed.2d 194, 86 S.Ct. 258 (1965).

Both reasons find substantial support in sound administrative practice and are fully within the province of § 2281.

A full discussion of the Michigan State University loitering ordinance is contained in Part II of this opinion.

This matter was presented at a full hearing on the merits of plaintiffs' claims. The court will address each of their contentions separately and in the order mentioned above.

I. *Bad faith enforcement.*

There is little dispute as to most of the facts in this case.

During the months prior to May 19th, the University and East Lansing communities experienced a number of incidents involving actual or potential violence and destruction of property. On February 17, 1970, groups of individuals, composed largely of students, did considerable property damage between the campus

proper and East Lansing City Hall. Many police officers who were attempting to control these groups were injured. Apparently part of the participants began their sorties from the Michigan State University Union building.

At the end of April or in early May, a large group of students held a political meeting in the lounge of the Michigan State University International Center. Testimony indicates that after this meeting dispersed damage was inflicted upon Demonstration Hall in an alleged attempted firebombing, and upon other buildings in the area. One witness recalled observing street lights being broken near Olds Hall at or near the time of these events. Two arrests for arson resulted from this incident.

On May 15, three days before the meeting involved in the present case, a group of students and others conducted a sit-in at Demonstration Hall. This building contains the offices of the Army ROTC department, and the group's activity was primarily a protest against ROTC's presence on the campus. The students' actions were non-violent, though possibly disruptive of the ROTC department's normal conduct of its affairs. They remained in the building after the 6:00 P.M. closing hour. At 8:00 P.M. they were informed by the Michigan State University Vice President for Student Affairs that if the building was not vacated in five minutes the occupants would be arrested. The announcement was then repeated by the Michigan State University Director of Public Safety Richard Bernitt. The police arrived, whereupon the protesters left the building. Immediately afterward rocks were thrown and windows broken on the north side of Demonstration Hall. No arrests were made.

Ingham County Prosecutor Raymond Scodeller testified that in early 1970 he had been called to the campus on numerous occasions in response to potentially explosive situations. Edwin K. Reuling, an assistant director of student affairs, stated that he had been on campus, during evening hours, on several days before and after May 19th when events appeared to administration officials to threaten violence.

It must be remembered that there is no evidence before this court that any of the plaintiffs in this case, or any of those arrested on May 19th, were directly involved in destructive activities on or around the Michigan State University campus. These incidents are recounted here only as part of the totality of circumstances necessary for proper understanding of the subsequent events more directly involved in this case, and of the character of the actions of President Clifton R. Wharton, Jr., and the duly constituted administrative officers of Michigan State University.

As part of this overall factual context the court takes judicial notice of the events which thrust themselves upon the national scene in early May. The military operations in Cambodia precipitated a marked increase in campus political activities at Michigan State University and throughout the nation. This upheaval was accompanied by the tragedies at Kent State and Jackson State, as well as the temporary closing, voluntarily or otherwise, of many colleges and universities.

It was thus in an atmosphere charged by the foregoing events that students and administrators were interacting on the evening of May 18–19.

The facts surrounding the specific incident involved in this action are as follows:

Prompted by the deaths of several Black students at Jackson State University, members of the Michigan State University community, including the ad hoc Action Group to Combat Racism (hereafter AGCR), requested President Clifton R. Wharton, Jr. to close the institution for one day as an act of protest. Dr. Wharton, by the afternoon of May 18, had decided against such action and suggested that students and others take more constructive measures to express their various concerns.

AGCR planned a meeting to discuss problems of racism. The meeting was apparently arranged sometime before the afternoon of May 18, and before President Wharton's comments above. The gathering was to take place at 8:00 P.M. in the Michigan State University Union, although the normal process of reserving meeting space in that building was not utilized by AGCR. President Wharton, and, no doubt, other Michigan State University officials were invited to attend. The meeting was apparently open to anyone interested in the topic of discussion.

Most of the testimony taken in this matter relates to events occurring in and around the Union between 7:30 P.M. on May 18, and 1:30 A.M. on May 19.

Interested individuals began gathering in a second floor area shortly after 7:30 P.M. Students, non-students and faculty members were present. At about 8:00 P.M. the group moved downstairs to the main lounge. All agree that there were approximately three to five hundred persons in attendance at this time. The group's activities in the lounge throughout the evening were described by participants as constructive, serious and concerned, and by all, including university officials, as peaceful and non-destructive.

The gathering, though attracting a large number of individuals, apparently lacked visible organization and direction. Michigan State University employees present in the Union that evening were not certain what subject the group was discussing or who the leaders were. Some witnesses described the scene merely as "a mass of individuals" milling about with a constantly shifting cast of characters filtering in and out of the building. Only one speaker, Black student leader LaMarr Thomas, addressed the gathering as a whole. His remarks were completed by 9:00 P.M. At this point students spontaneously broke up

into small informal groups to pursue their own particular interests, or merely left the building.

Shortly after Mr. Thomas' speech a small group of people announced their intention to "levitate" [3] the Michigan State University Administration Building and promptly departed. At 9:30 the gathering in the Union lounge broke up into two groups. Approximately two hundred people remained on the first floor to continue with discussions, while the remainder either left the Union or went upstairs to fourth floor faculty offices to plan workshops on racism for the following day.

The normal closing hour of the Michigan State University Union is 11:00 P.M. All students were aware of this rule. The large group in the lounge had not substantially decreased in numbers or enthusiasm as that hour approached, and those involved wished to remain to continue their activities. It is here that one of the few conflicts in testimony developed. Gary Sommer, a Michigan State University graduate and Lansing resident testifies that he approached the assistant manager of the Union, Jack Ostrander, at about 10:45 P.M. and told him of the group's nature and purpose, that it was at all times peaceful and that nobody wanted to be arrested. He asserts that he inquired about whether the building's hours could be extended, and indicated that his inquiry was an "official request." Sommer recalls that Ostrander's response was to the effect that "you are putting me on the spot; higher-ups will have to make that decision."

Mr. Ostrander relates a somewhat different conversation. He testifies that Sommer asked either "can we stay all night," or "what will happen if we stay all night?" Ostrander's response was that others would have to make that decision and if the group remained in the building he would have to report such

---

3. "Levitation" is apparently a process whereby one invokes the aid of mystical powers to remove that which is offensive from one's sight. If all goes well, upon performance of the appropriate

ritual an object will simply rise into the air and disappear. There was no testimony as to the details of this process, nor did the court request a demonstration.

fact to his superiors. He remembers asking Sommer if he was making an official request and recalls an essentially negative response. Ostrander claims he did not tell anyone that he would relay any request to higher officials.

There is no indication that anyone in the group tried to make direct contact with other university officials concerning an extension of Union hours.

At 10:55 P.M. Ostrander announced over a public address system that the Union would close at 11:00, and requested that the building be cleared. At 11:00 he announced that the Union was closed and repeated the request to vacate the premises. He made an identical announcement again at 11:15. The AGCR group did not comply with these requests. In the words of one student participant, they "were having a good discussion and wanted to stay."

Following the 11:15 P.M. announcement and before the arrests, Sommer had additional brief conversations with Ostrander. The testimony is in substantial agreement that the former continued to inquire whether there was any university response to the group's actions and intentions. Ostrander continually replied that he would keep them advised and that he knew of no further developments.

At this point we shift attention from the Union to the Michigan State University Department of Public Safety.

The evening of May 18 saw considerable property damage inflicted upon the Michigan State University campus. University officials were faced with "trashing," [4] window breaking, and other acts of vandalism carried out by individuals or small groups. Although no such activities were reported at or in the Union itself, plaintiffs concede that destructive acts were occurring on other parts of the campus contemporaneously with the AGCR Union meeting. Testimony also established that those in the Union were aware of these activities.

High University officials, including President Wharton, gathered at the Department of Public Safety to attempt to deal with the pattern of events unfolding that evening. Defendants produced two witnesses who participated to some degree in this process: Ingham County Prosecutor Raymond Scodeller and Michigan State University Director of Public Safety Richard Bernitt.

Mr. Scodeller testified that he arrived on campus at about 9:00 P.M. and went directly to the police administration building. Sometime before 11:30 he toured the campus area in a patrol car and observed some property damage to university buildings. He apparently also at this time passed the Union, noticing many people both inside and outside the building. He did not enter the building.

Returning to the conclave of university officials, he was informed of physical damage done to a building owned by IBM and located near the campus. Focusing attention on the Union, Scodeller recalls that his "best information" from plainclothesmen on the scene was that those suspected of indulging in various destructive acts were filtering back to that building. No reports of damage at the Union itself were received. Shortly after 11:00 P.M. he was advised that the closing announcements had been given by Mr. Ostrander. He was not aware of any requests by students to keep the building open, or that the building occasionally remained open past 11:00. Nor was he appraised of the subject matter of the Union meeting.

At approximately 11:30 President Wharton requested that arrests be made. Scodeller then authorized the ensuing arrest procedure. The prosecutor testified that the sole reason for this action was the violation of the trespass laws, and that neither the political nature of the meeting nor its specific content played any part in that decision, or in the subsequent decision to prosecute. Finally, Mr. Scodeller was aware that at the

4. "Trashing" may be generally defined as any act of property destruction. These acts of vandalism inflict a substantial financial loss upon the recipient.

May 15th ROTC sit-in students had been warned in advance of potential arrest, but denied ever advising anyone concerning such a procedure. He claimed to have no knowledge of whether students were allowed to leave the Union before arrests were made.

Michigan State University Director of Public Safety, Richard Bernitt, was also involved in the 11:30 arrest decision. Unlike Scodeller, he remained at his headquarters the entire evening. Bernitt testified that he knew of the 8:00 P.M. Union meeting, but did not know anything of its content. At approximately 10:00 he received information that forty to fifty people left the Union and headed toward Olds Hall and the Administration Building. Damage was later done at these locations, but authorities were unable to apprehend those responsible.

The threat of damage to university property that evening prompted Bernitt to request the assistance of additional officers from surrounding police agencies. This was done at about 10:30. A total of approximately one hundred fifty officers, under Bernitt's command, were eventually on duty on the Michigan State University campus. They attempted to deal with "trashing" and window breaking, but affected no arrests.

After 11:00 P.M. attention focused on the AGCR meeting. Although he had no report of violence at the Union, Bernitt and others were apparently concerned with potential destruction either to that building if the group remained, or elsewhere after they departed. He knew nothing about a request to extend Union hours. He recalls being advised that Ostrander had announced the closing of the building, following which the decision to arrest was made. He was aware of no intent on the part of officials to "crack down" on demonstrations, but knew that the university had been under "pressure" to prevent property damage and preserve safety.

About two hours were required to assemble and position the necessary officers to carry out the actual arrests.

Defendants also filed an affidavit of President Wharton covering the May 19th incident.

After briefly reviewing the violent events which occurred subsequent to February 19, 1970, President Wharton recounted the damage done to the Administration Building and the IBM building on the evening of May 18th. He states that the University was administered during this "difficult period" with two objectives: to protect life and to keep the institution open for the benefit of those seeking an education. With respect to the Union arrests, it is his position that the AGCR group's conduct in ignoring repeated requests to leave, under the circumstances at that time, left no alternative but arrest. Other testimony firmly established that Dr. Wharton was not antagonistic to the views of the AGCR group, and indeed encouraged constructive actions within the confines of valid state and local laws.

We now return to the Union to trace the course of events at that location following the announcements that the building was closed.

Sometime after 11:00 P.M. Ostrander had numerous telephone contacts with the administrators and university police officers gathered at the Michigan State University Department of Public Safety. The testimony indicates that a number of such conversations took place between 11:00 and 1:30 A.M. the following morning. Ostrander testified that at no time did he transmit a formal request for extended hours to higher officials because he did not believe such a request had been made. He did, however, relay the substance of all conversations he had and observations he made. According to Ostrander these telephone communications consisted primarily of requests for and the supplying of information as to the current situation in the Union building. He claims he was never told what decisions had been made, and was advised only to "sit tight." On at least one occasion before the final telephone communication at 1:25 A.M. Ostrander passed this response on to Gary Sommer.

At approximately 1:25 A.M. Ostrander had his final telephone conversation before the arrests. He spoke to an officer of the Department of Public Safety. In response to a question as to what was going to happen, this officer replied "count to ten, make another announcement, and we'll be there."

Ostrander proceeded to repeat the substance of his 11:00 and 11:15 announcements, whereupon police officers entered the building, blocked the three exits, and initiated one hundred thirty-two arrests.

Assistant Director of Student Activities Edwin Reuling was also in the Union building on the evening of May 18–19. He arrived at about 8:30. His testimony parallels that of Mr. Ostrander. Reuling was not aware of any request to keep the building open. He recalls many inquiries as to what would happen if students remained in the building, and "probably" responded that if he did not hear differently things would happen "the same as before." This apparently was a reference to the May 15 sit-in and the procedure used at that time to clear Demonstration Hall.

Reuling also had numerous telephone contacts with the Department of Public Safety. He too conveyed his impressions of events to higher university officials, including the group's intent to remain past 11:00 and the peaceful nature of the group's activities. He did not recommend that the meeting be allowed to continue, but informed his superiors that the students he knew at the gathering were not the type to cause property damage. Reuling was also not informed of the Michigan State University actions or of the arrest decision. He too was told to "sit tight."

Reuling also testifies that during the period after 11:00 P.M. he overheard reports from students concerning police activity outside the building, including information on the buildup of police personnel before the arrests. He recalls that many students were constantly moving in and out of the building, and also that students were at this time manning the double doors, equipped with panic bars, which allow access to the Union. Another witness, Professor Joseph Hanna, entered the building at about 11:30 and remembers nothing unusual about his entrance.

The arrest of those in the building was carried out without violence. The police did not allow anyone to leave following Ostrander's final 1:30 A.M. announcement. There is some dispute as to whether people near the entrances on the outside of the building were "swept in" by the advancing police. Although everyone in the building was eventually arrested, there is testimony to the effect that certain individuals were purposely arrested first. There is also testimony that one officer expressed great satisfaction with "finally getting" one of the student-participants.

It has been established that the Union had on occasion remained open past 11:00 P.M. to accommodate meetings and social events. Such extended hours normally run only to midnight. The Michigan State University Union rules provide that the hours may be extended at the discretion of the manager. There is no established procedure required for such an extension, although a group should reserve the meeting space in the Union through the manager's office before scheduling their session. The AGCR meeting was rather hastily arranged, but the organizers apparently had ample time to make this simple arrangement. They did not do so.

Mr. Ostrander could not recall any arrests previously made in the Union for remaining in the building past 11:00 P.M.

A number of witnesses testified concerning the alleged impact of these arrests on subsequent political and expression-related activities at Michigan State University.

One student, active in political affairs, states that after May 18 she feared she could be arrested for "almost anything." Black leader LaMarr Thomas also feels that it is difficult to know with certainty what could be done without danger of arrest. Similar expressions of general

insecurity were also made by other witnesses.

William Derman, Assistant Professor of Anthropology and African Studies, who participated in the AGCR gathering but left before the arrests, described a more concrete example of the above-expressed concern. He attended a June 2 meeting, essentially non-political, which was held in one of the Union's meeting rooms. At 10:55, in the midst of discussion, a univerity policeman walked past the rooms. The participants hastily abandoned the meeting. He also regrets that some campus discussion had turned from the substantive issue of racism to whether or not the May 19th arrests were justified. A similar opinion was expressed by Allan D. Hurwitz of the Michigan State University Center for Urban Affairs.

Plaintiffs allege that the pattern of behavior of University officials revealed by the above facts compels the conclusion that their actions on May 18–19 fall within the condemnation of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

In Dombrowski the Supreme Court granted declaratory and injunctive relief to prevent the threatened prosecution of civil rights organizers under an unconstitutional Louisiana criminal syndicalism statute. The court found, in essence, that the state's action was a sham intended only to suppress exercise of first amendment rights and that the resulting "chill" on constitutionally protected activities was great enough to overcome the strong federal policy of non-interference with state criminal proceedings.

Dombrowski's relief is limited to extreme circumstances. Mr. Justice Brennan, expanding upon his Dombrowski opinion in the subsequent case of Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), states:

> "Dombrowski recognized * * * the continuing validity of the maxim that a federal district court should be slow to act 'where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court' * * * Federal interference with a State's good-faith administration of its criminal laws 'is peculiarly inconsistent with our federal framework' and a showing of 'special circumstances' beyond the injury incidental to every proceeding brought lawfully and in good faith is requisite to a finding of irreparable injury sufficient to justify the extraordinary remedy of an injunction."

The theory of this cause of action is no more clearly phrased than in Mr. Justice Fortas' Cameron dissent:

> "Dombrowski is strong medicine. It involves interposition of federal power at the threshold stage of the administration of state criminal laws. Dombrowski's remedy is justified only when First Amendment rights, which are basic to our freedom, are imperiled by calculated, deliberate, state assault. And those who seek federal intervention bear a heavy burden to show that the State, in prosecuting them, is not engaged in the use of its police power for legitimate ends, but is deliberately invoking it to harass or suppress 1st Amendment rights. Dombrowski should never be invoked when the State is, in substance and truth, engaged in the enforcement of valid criminal laws. Ordinarily, the presumption that the State's motive was law enforcement and not interference with speech or assembly will carry the day." (Emphasis supplied.)

Dombrowski and its progeny thus establish two very demanding criteria for the relief requested in this case. First, a criminal proceeding must be initiated not as a good faith effort to enforce the legitimate state interest reflected in a valid statute, but solely for the purpose of discouraging the exercise of first amendment rights. Second, the proceeding must in fact have a "chilling effect" on the exercise of those rights. Cameron v. Johnson, supra; Sheridan v. Garrison, 415 F.2d 699 (5th Cir. 1969).

Plaintiffs need not produce express declarations of sinister purpose in order to fulfill the above criteria. It is sufficient to establish a combination of circumstances which compel such an inference. Cox v. Louisiana, 348 F.2d 750 (5th Cir. 1965).

Plaintiffs point to occasions when the Union remained open past 11:00 for other events, to the fact that arrests had not previously been made for similar violations, and to the "well-established" procedure of providing warning of impending arrest as indicating discriminatory treatment of the AGCR meeting.[5] They label the failure to communicate the 11:30 arrest decision to administrative officials on the scene and the alleged delay in acting upon a request to extend building hours as purposeful deception or entrapment designed to keep people in the Union pending arrival of the necessary police. They claim that because high officials were not informed of the subject matter of the meeting and made no personal visits to the Union, they purposely disregarded any relationship between AGCR activity and the violence elsewhere on campus. Finally, they cite the presence of outside pressures, unrelated to trespass laws, which allegedly encroached upon the University decision making process in this instance.

Plaintiffs contend that the combination of these factors indicates that Michigan State University officials used the May 19th arrests as a mere pretext for effective suppression of speech. The court cannot agree. The court finds in this case that there was "no harassment, intimidation, or oppression of these complainants in their efforts to exercise their constitutional rights, but they were arrested and they are being prosecuted in good faith" for their violation of a valid trespass statute. Cameron v. Johnson, D.C., 262 F.Supp. 873, at 876.

Two points will frame the court's discussion of this aspect of its decision.

It must first be understood that this court is not passing upon the wisdom of any University action or the judgment, within the bounds of discretion constitutionally allowed, of any University officials. It is also not passing upon the merits of the substantive criminal charges pending against these plaintiffs. Thus the issue here is neither University mistakes nor the possibility of conviction, but whether the criminal process has purposely been so abused, to the detriment of first amendment values, as to compel federal intervention to prevent these prosecutions.

Second, it should be re-emphasized that Dombrowski and Cameron place a heavy burden upon these plaintiffs. They must show more than a careless or rash official action. They must establish a "deliberate, calculated assault" on first amendment rights.

It is true that Michigan State University treated the AGCR meeting differently than it treated groups in somewhat similar circumstances in the past. The University decided to strictly enforce the 11:00 P.M. Union closing hour. Officials also apparently decided to arrest violators rather than make further attempts to clear the building. The court, however, simply cannot infer from these actions that defendants' purpose was to curtail constitutionally protected activity. In fact, the opposite conclusion is justified from President Wharton's encouragement of constructive student political activity. Considering all of the circumstances as they appeared that evening, those steps are indeed much more consistent with a desire to prevent potential violence and deter further episodes of occupation of Michigan State University buildings than with a purpose to chill political discussion. The fact

---

5. Plaintiffs are not claiming that these differences in treatment amount to a denial of equal protection. Nor are they claiming a first amendment right to use university facilities whenever they please. The thrust of their position is that such discrimination that does exist, along with other circumstances herein enumerated, provide a basis for concluding that Michigan State University's enforcement action was in bad faith.

that the action taken might be harsh or that the students were surprised does not erode the constitutionality of the bases upon which the University was most likely proceeding.

Circumstances provide obvious explanation of why the University might reasonably choose to treat this group differently than a dance or county political convention. The Union gathering could only have appeared to observers to be of an unpredictable nature. On that evening property damage was widespread, and officials had information, accurate or not, that small groups were filtering in and out of the Union contemporaneously with violence elsewhere. Although perfectly peaceful, the group's apparent lack of direction and constantly changing composition could give little assurance, despite the then good intentions of those present, that it would remain so. Add to this the curiosity about "staying all night"—accompanied by a request to extend hours or not—and the fact that the students were manning the doors, thereby effectively preventing the closing of the building, and viewed in light of the May 15th occupation of the Demonstration Hall, Michigan State University officials could justifiably fear that the situation might well get out of control. If perpetrators of violence were indeed seeking anonymity in the large group of people gathered at the Union, the prospect of serious damage to that building if a sit-in or occupation developed is certainly not an unrealistic one. The decision to arrest is also consistent with a fear of property damage similar to that which occurred at Demonstration Hall on May 15th.

The fact that the 11:30 arrest decision was not communicated to those in the building indicates that officials desired that arrests be effectively carried out.

It is of no value in inferring that the motive for the arrests was other than the protection of valid substantial state and community interests.

The testimony surrounding the alleged request to extend Union hours has satisfied this court that, assuming such a request was in fact made, it was either misunderstood or merely negligently overlooked. The most the evidence establishes is faulty communication. There is nothing with which to conclude that the request was purposely sidetracked or left unanswered in order to mislead the plaintiffs. Thus there is no basis in this evidence to infer ulterior purpose on the part of the Michigan State University officials.

Plaintiffs' contention that no effort was made by Michigan State University decision makers to keep informed of events at the Union is unsupportable. Testimony reveals continuous telephone contact between the Union and the Department of Public Safety, as well as occasional visits by plainclothes detectives. The fact that President Wharton or other high University officials prudently remained at the central clearinghouse for information about campus wide activities is no indication of hostility toward plaintiffs' constitutionally protected activities.

Finally, the fact that a university administration is subject to outside pressures, from responsible groups or otherwise, is well known to everyone. It is a prime characteristic of a democratic republic. But this does not mean either that a particular action is necessarily influenced by such pressures, or that, even if so, the action therefore is burdened with constitutionally prohibited purpose.

Thus, speculative evidence of outside pressure adds no support to plaintiffs' allegation of bad faith.[6]

---

6. Other factors which the court considered are as follows:
   (a) The type of state interest involved. Here the trespass statute reflects the undoubted authority of state officials to protect and preserve public property, to allocate its use in a reasonable manner, and to insure its con-

tinued availability for public purposes. There are ample grounds to believe that state officials intended to protect these interests.
   (b) The probability that the state's action represents a continuing threat to plaintiffs' activities. Here there is no evidence whatsoever of a plan or

In these facts plaintiffs see bad faith and harassment on the part of the University administration. It is quite apparent, however, that the entire university community has itself been the victim of considerable harassment, at least since February 12. "Trashing" and property destruction since that date could only have resulted in substantial interference with the educational pursuits of those on the Michigan State University campus. Plaintiffs can claim no interference with their activities until after the Union closing hour and following the repeated requests to leave.

The Michigan Constitution gives to the Michigan State University Trustees the administrative authority to regulate University affairs. Included is the responsibility of maintaining property and facilities necessary for the functioning of a modern educational institution. It is essential that reasonable rules be established and enforced for the maximum use of University resources. Without such rules a university runs the risk of becoming a scene of chaos rather than a seat of learning.

In Cox v. State of Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965), Mr. Justice Goldberg said:

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy."

■■ Plaintiffs' counsel agrees that students, faculty or others do not have an absolute right to use buildings any time, any place, and for any purpose they choose. The court can only add that the University has the right and the duty to insure that the unfettered pursuit of truth, knowledge and understanding is not deliberately interrupted by those who seek to advocate, to the detriment of the above values, their own partisan interests. It thus follows that the University may act when it reasonably foresees that action may be necessary to prevent such a result.

In final argument counsel for plaintiffs accused the University of making a "rash, heated and uninformed decision." This is indeed the most that can be claimed for their evidence. Assuming counsel is correct, his argument proves too much. Dombrowski does not contemplate federal intervention in the state criminal process to remedy mere errors of judgment on the part of state officials. Even if these plaintiffs are the victims of inaccurate information and misunderstanding, such problems cannot be resolved in a federal court.

Plaintiffs have also failed to establish the second element required for Dombrowski relief, namely, such an impact upon protected activities as to constitute a "substantial loss of or impairment of freedoms of expression" if plaintiffs are forced to await state court adjudication and review of their cases. Dombrowski, supra, 85 S.Ct. at page 1120, 14 L.Ed.2d at page 28. Again referring to Cameron, 88 S.Ct. at page 1340, 20 L.Ed.2d at page 189: "[a]ny chilling effect on * * protest and expression that flows from good faith enforcement of this valid statute would not, of course, constitute that enforcement an impermissible invasion of protected freedoms. * * * "

The evidence in this case establishes nothing "beyond the injury incidental to every proceeding brought lawfully and in good faith * * *." Cameron, supra, 88 S.Ct. at page 1339, 20 L.Ed.2d at

---

scheme to harass these plaintiffs in the continued exercise of protected activities.

(c) The prospects of the state's ultimate success on the criminal charges involved. Here there appears to be a reasonable basis for an expectation of successful prosecution and appeal.

(d) Whether the statute is a direct or indirect regulation of expression and whether the very conduct sought to be made criminal is constitutionally protected.

page 189. Students are understandably more aware of the closing hours of university buildings and of the need to be "very careful" not to break valid regulations, but this does not indicate that the quality of discussion on the Michigan State University campus has been unconstitutionally substantially impaired. It is axiomatic that every cooling breeze which lowers the temperature of political activity is not thereby a constitutionally prohibited "chill' of the rights of free expression.

In summary, the evidence presented by plaintiffs does not reveal circumstances sufficient to justify the conclusion required by the Dombrowski doctrine.

Accordingly, plaintiffs' request for a preliminary injunction against prosecution under the trespass statute is hereby denied.[7]

II. *Unconstitutionality of the Michigan State University ordinance.*

Plaintiffs also seek declaratory and injunctive relief to prevent prosecution under an ordinance adopted by the Michigan State University Trustees.[8]

Courts have not hesitated to declare unconstitutional criminal statutes which are so vague as to provide no ascertainable standards for administration, or so overbroad as to allow enforcement encroaching upon constitutionally protected areas. "Loitering," "vagrancy," and "disorderly conduct" statutes have been particularly vulnerable to such attack. Baker v. Bindner, 274 F.Supp. 658 (W.D. Kentucky 1967); Ricks v. Dist. of Columbia, 134 U.S.App.D.C. 201, 414 F.2d 1097 (D.C.1968); Goldman v. Knecht, 295 F.Supp. 897 (D.C.Colo.1969).

Mr. Justice Frankfurter's characterization of loitering and related statutes in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948) serves to describe the ordinance which is now before the Court:

"These statutes are in a class by themselves, in view of the familiar abuses to which they are put. See Note, 47 Col.L.Rev. 613, 625. Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of the police and prosecutor, although not chargeable with any particular offense. In short, these statutes * * * are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided." 333 U.S. at 540, 68 S.Ct. at 682.

Loitering, lingering, reflecting, ruminating, recollecting, or reconnoitering, may in a sense in time and in space, or in the intellectual or mind's eye, be interrelated concepts perfectly harmless and indeed desirable. Hopefully these are a part of a university's atmosphere and circumstances.

These words have no sinister meaning and imply no wrongdoing or misconduct. They stand in sharp contrast to trashing, window breaking, and other miscellaneous acts of indiscriminate vandalism.

■ Although faced with a "loitering" ordinance, the court believes it should, on the facts presented here, abstain from decision on this aspect of plaintiffs' case. Since Dombrowski and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), abstention in situations such as this is difficult to justify, and should not occur at the price of sacrifice of first amendment rights. However, where the evils foreseen by those cases are not present, abstention is still available to avoid unnecessary decision of constitutional questions and undue interference with state affairs.

This ordinance may be capable of saving construction in state court. The proscribed conduct is "loitering" or "trespassing." Defendant Scodeller argues that "loitering" is meant only to cover conduct that is also within the definition of "trespassing." Trespass, as seen in the statute involved in this case, has been constitutionally prohibited in Michigan.

---

7. Since the court does not reach the question of relief, it is not necessary to decide whether 28 U.S.C. § 2283 would bar an injunction in this case.

8. See, infra, footnote 2.

Defendants' line of argument is not so clearly without merit as to warrant preclusion of a state court decision on the issue.

Second, the state has elected not to proceed against these plaintiffs under the Michigan State University ordinance. This fact alone will not necessarily preclude decision of the vagueness issue where the challenged law remains available and is likely to be used in a manner which interferes with constitutional rights. Carmichael v. Allen, 267 F.Supp. 985 (N.D.Ga.1967); University Committee to End the War in Vietnam v. Gunn, 289 F.Supp. 469 (W.D.Tex.1968). Here, however, there is no evidence that the use of this ordinance has hindered the valid exercise of constitutional rights. There is likewise no indication of future harassment. This record carries no imminent threat of constitutional deprivation, and is thus factually distinguishable from both Dombrowski and Zwickler. In this light, and also considering the strong likelihood that Michigan State University will reconsider the text of the ordinance in question, this court will presently abstain from making any decision on this issue.

The court will, however, retain jurisdiction of this issue.