**Delton CHASE et al., Plaintiffs**

**v.**

**Richard TWIST et al., Defendants.**

**Civ. No. J–70–C–42.**

United States District Court,
E. D. Arkansas,
Jonesboro Division.

Oct. 2, 1970.

Memorandum Opinion No. 2
Oct. 30, 1970.

Philip E. Kaplan, John W. Walker, Little Rock, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., for school officials.

Vincent E. Skillman, Jr., W. Memphis, Ark., for sheriff.

Elton A. Rieves, Jr., and Elton A. Rieves, III, W. Memphis, Ark., for Mayor, Police Chief and City officials.

## MEMORANDUM OPINION

EISELE, District Judge.

The application in this case for temporary injunctive relief was heard on September 16 and 17, 1970. At the conclusion of the hearing the Court directed counsel for the various parties to file memorandum briefs not later than the 24th day of September, 1970. Those briefs were timely filed. The Court understands that an amended complaint has also been filed which adds several additional parties plaintiff and several additional parties defendant. The Court is not advised whether service has been obtained upon the amended complaint.

In any event the Court will ignore the amended complaint for the purposes of passing upon the application for temporary relief.

Several distinct causes of action are set forth in the original complaint. The action against the Board of Directors of the Earle Special School District and Mr. Sam Bratton, Superintendent of the District, is based upon allegations that said defendants are "continuing their policy, practice, custom and usage of maintaining segregated classrooms for Negro and white pupils * * * and * * * a policy, practice, custom and usage of discriminating, on the basis of race against black students and faculty * * *." The other causes of action are essentially against county and city officials, more particularly the mayor of Earle, Arkansas, the chief of police of Earle, Arkansas, and the sheriff of Crittenden County. The plaintiffs ask a temporary and permanent injunction against such defendants, enjoining them " * * * from imposing curfews against black persons, arresting black persons for demonstrating in support of constitutional rights, from deputizing only white persons, and from engaging in acts with any other persons in which to deny plaintiffs the opportunity to exercise rights guaranteed under the constitution of the United States."

The Court has decided to take up the various causes of action separately and, in this first memorandum, to deal only with the issues involving the "school" case. The Court hopes to render its decision in the non-school portions of this preliminary proceeding at an early date. In handling the matter in this manner the Court is not pre-judging the question with respect to the possible severance of the various causes of action in the future handling of the case. Nor does the Court overlook the obvious factual connection between the events relating to the school problems and the other causes of action. The Court feels that there is a certain advantage in handling the applications for temporary relief in this manner and it further feels that there is slightly more urgency in connection with the "school" problem since it appears that the great majority of the black students in the Earle Special School District are out of school.

With respect to the school case, the plaintiffs allege that during the 1969–70 school year the defendant school directors operated two separate school complexes: (1) the Dunbar School, grades 1 through 12, attended only by black students, numbering approximately 1,200; and (2) the Earle School, grades 1 through 12, attended overwhelmingly by whites. It is further alleged that on August 28, 1970, the school board placed into effect a desegregation plan it had negotiated with the United States Department of Health, Education & Welfare, and that under that plan all faculties, facilities, classes, activities and programs were required to be operated without racial discrimination. It is alleged that the 1970–71 school year began on approximately August 28, 1970. As operated, plaintiffs claim that the classes within the schools are substantially segregated by race; black teachers teach substantially black classes while white teachers teach substantially white classes; activities and participation therein are operated on a racially discriminatory basis; black pupils are subjected to penalties and punishment for conduct which do not apply to white pupils; and black faculty, principals and coaches and other black administrative personnel have been demoted and/or relegated to subordinate positions solely because of their race.

The complaint also alleges that the defendant school board and school superintendent engaged in practices having the effect of suppressing black expressions of opposition to the policies, practices, customs and usages complained about.

The school case is a class action and the plaintiffs allege that they and members of their class have repeatedly sought to bring their grievances before the school board for resolution but that such efforts were consistently denied,

refused, and/or rejected. Plaintiffs pray "for a temporary restraining order restraining the school board from continuing to engage in or engaging in any practice, policy, custom, or usage of racial discrimination and further from punishing plaintiffs and members of their class for their peaceful or other lawful protests against said racially discriminatory practices."

In addition to the complaint the plaintiffs filed a "Motion For Temporary Restraining Order" on September 14, 1970, asking the Court to prohibit "defendants Twist, Morrison, Cloar; Cato, Atkins, and Bratton, (a) from maintaining segregation by classroom among faculty and student bodies in the Earle Special School District; (b) from sponsoring and maintaining activities and programs operated on a racially discriminatory basis; and, (c) from demoting or otherwise discriminating against black staff, administration and faculty." In support of their motion plaintiffs alleged that they would show:

"1. A class action to eliminate discrimination in the Earle Special School District was commenced on September 10, 1970.

"2. Defendants have maintained segregated classrooms and faculty assignments and otherwise discriminated against black students and faculty."

The Court will not make a complete statement of all the facts at this time but will attempt to make those findings which are germane to the issue of temporary relief in the school case.

Prior to this school year the defendant school district operated an essentially dual school system. The school population of the Earle Special School District is comprised of approximately 950 black students and approximately 550 whites. The Dunbar complex consisted of an elementary school, a junior high school, and a high school attended only by black students. The Earle school complex also had an elementary school, a junior high and a high school and was attended by approximately 550 whites and a nominal number of blacks.

On or about May 20, 1970, the Department of Health, Education and Welfare approved a plan for the operation of the Earle Special School District for the school year 1970–71. The basic requirements of the plan were set forth in a letter addressed to the superintendent from Lloyd R. Henderson, Education Branch Chief, Office for Civil Rights, Department of Health, Education & Welfare, on said date. I quote the basic provisions of the plan as contained in said letter:

"It is our understanding that the grade structures of your school will be fully desegregated for the 1970–71 school year:

"Grades 1–3 will be housed in the Earle Elementary School; grades 4–6 at the Dunbar Elementary School; the present Dunbar High School will house all students in grades 7–9; and grades 10–12 will be assigned to the Earle High School.

"Members of my staff have reported that the present assignment of staff does not meet the constitutional standards set forth in the United States Circuit Court of Appeals in the Singleton v. Jackson case * * *

* * * * * *

"It is our understanding, however, that you plan to reassign some of your present teachers and to fill vacancies at the high school to meet the standards set forth above.

"In addition, we understand that students will be assigned to classes in each school so that no segregated classes will result.

"It is further understood that all other facets of the operation of the school system as outlined above will be conducted on a racially non-discriminatory, nonsegregated basis. This includes facilities, faculties, services, classes, activities, programs and transportation, but is not limited thereto."

The plaintiffs and almost all of the other black students in the school dis-

trict have attended school only six days during the current school year. They attended from Monday, August 31, 1970 until Friday, September 4, 1970. On Monday, September 7, they left school for reasons discussed below and, so far as the Court knows, they have not returned to school since that date.

The plan, the provisions of which were quoted above, called for dramatic changes in the manner of operating the schools of the Earle Special School District. Prior to the implementation of that plan on the last of August, 1970, the defendant school district had not only operated an essentially dual system but had operated the Dunbar complex in many ways as an inferior institution and had at least tolerated some inequities to exist in the programs and activities of that complex when compared to those of the essentially all-white Earle complex. The school board had made very little progress since the original *Brown* decision in bringing the operations of its schools in line with constitutional requirements. This is not to gainsay the fact, however, that the board, through good faith negotiations with representatives of the government, had voluntarily agreed to operate its schools and other facilities for this school year in accordance with a written plan which, if followed in good faith, would meet the requirements of the law. The plaintiffs do not attack the plan. Rather they contend that the defendants have departed from that plan in the implementation thereof.

The students in the system are grouped according to the results of achievement tests and assigned to classes accordingly. It appears that, even prior to this year, such test scores were used for this purpose. It further appears that this year the school officials permitted any white student who by virtue of his achievement score would fall in a predominantly black section to transfer to a predominantly white section. This has resulted, according to the evidence, in some all-black sections and some predominantly white sections at each grade level.

The plaintiffs acknowledge in their memorandum that achievement scores or intelligence scores may have some valid uses in normal educational programs but they contend that when such scores lead to racial segregation they are intolerable, especially in the early years of desegregation programs. They also contend that the disparity in achievement between blacks and whites results directly from the disparity in the quality of educational opportunities provided the blacks under the prior dual system.

■ The Court does not feel that it should at this time strike down the practice of assigning students on the basis of achievement tests on the strength of the evidence introduced in support of the application for a temporary injunction. The Court, however, will want this issue fully developed in the hearing on the merits. In the meantime it is clear that the defendants are granting exceptions (in applying the results of the achievement tests) on a discriminatory basis. The plaintiffs are therefore entitled to a temporary injunction requiring the defendant school officials to administer those achievement tests which they utilize on a strictly non-discriminatory basis, "across the board." The Court is really not in a position to pass upon the legitimacy of the defendants' utilization of such achievement tests until it has an opportunity to learn the effect and consequences thereof when applied *without respect to race*. Additionally, the black children who are members of the class represented by the plaintiffs will not be in a good position to attack the legitimacy of the use of such achievement tests until they return to school and give the defendants an opportunity to apply same in conformity with this opinion. Otherwise we must deal with the question abstractly.

In reaching this result the Court is taking into consideration the statements

of counsel for the defendants that, in the event the Court held that the achievement criteria must be applied uniformly, the data could be reexamined and the necessary reassignments made within a few days. Counsel for the defendants further points out that the first graders had not yet been tested, but that it was expected they would be within a few weeks, so that they, too, could be reassigned in accordance with the test results. The order of the Court will therefore be that all students above the first grade be assigned on a completely non-discriminatory basis within five days of the issuance of this opinion and that first graders must be tested and properly assigned within two weeks. The Court will then scrutinize the results achieved at the time of the final hearing.

The plaintiffs also complain about the assignment of the faculty, and this Court agrees that the manner in which the faculty was assigned during the first six days of school does not appear to comply with the written plan of desegregation. The evidence indicates that black teachers have been assigned to teach only all-black classes with the exception of one teacher who teaches one integrated class at the junior high level. White teachers are apparently assigned to teach all of the other integrated classes.

Under the law and under the plan, the plaintiffs are entitled to have faculty assignments made upon a non-discriminatory basis. Even though it finds that, superficially at least, the present pattern of faculty assignment appears clearly subject to attack, the Court does not feel that this finding should be the predicate for temporary injunctive relief. The attorney for the school defendants points out that the hearing on the application for temporary relief was set on exceedingly short notice and that the defendants had a wholly inadequate opportunity to prepare their case. The Court is not satisfied with the status of the evidence with respect to faculty assignment and does not feel that there is adequate proof

to serve as a guide pursuant to which a temporary order might reasonably be entered at this time. The Court, however, expects the defendants to note its tentative preliminary findings with respect to faculty assignment and to reevaluate their practices and procedures in the light thereof prior to the hearing on the merits.

Plaintiffs contend that, with respect to many of the extra-curricular activities, there has been discrimination against the black students. Evidence supporting these contentions was introduced, particularly with respect to the organization of the student body government and the selection of cheerleaders. There was also evidence that for the first few days of school class attendance rolls for black and white students were kept and called separately, and in some cases that blacks and whites were generally seated in separate groupings within certain classes. The defendants, however, contend that such arrangements were not intended to be permanent and, indeed, that some were entirely accidental. They contend that they arose generally with the confusion of the opening days of school. The Court concludes that the plaintiffs are not entitled to temporary relief with respect to these charges and that the defendants are entitled to an opportunity to, in good faith, bring the operation of the extracurricular activities, the classroom rosters and seating arrangements, into conformity with the desegregation plan after the return to school of the plaintiffs and those whom they represent. This matter, too, can best be explored upon final hearing. It is also assumed during this interim period prior to the final hearing that the school officials will advise all students on a nondiscriminatory basis as to their rights to participate in the various activity programs and of the manner in which they should go about exercising those rights.

The plaintiffs complain about the manner in which the defendants have filled approximately eight faculty positions. They also contend that the de-

fendants did not objectively evaluate black personnel in comparison with white personnel in preparation for the operation of a unitary school system under the desegregation plan. They complain about the assignments of certain personnel including the principal of the former black facility, and the black basketball coach at the formerly black Dunbar School. Assuming plaintiffs' standing to raise these questions —and the Court has doubts about such standing—it would seem preferable to dispose of such issues at the hearing on the merits.

In paragraph VII(A) of the original complaint the plaintiffs alleged that the defendants operated the schools on a racially discriminatory basis in that, inter alia, "black pupils are subjected to penalties and punishment for conduct which do not apply to white pupils." The proof introduced at the two-day hearing upon the application for temporary relief did not sustain the quoted allegation.

With respect to the allegations in paragraph VII(A) 5 of the original complaint that "black faculty * * * and other black administrative * * * personnel have been demoted and are relegated to subordinate positions within the school system solely because of their race or color," the proof introduced at the hearing was certainly not clear enough to warrant any temporary relief with respect to the quoted allegations. Furthermore, as indicated above, there is a question as to the standing of these plaintiffs to raise such issues. The plaintiffs, however, will be permitted to introduce additional evidence with respect to such issues at the time of the final hearing unless the Court, prior to such final hearing, rules adversely to them on the question of standing.

With respect to the allegations contained in paragraph VII(B) of the original complaint, the Court finds that the proof introduced at the preliminary hearing does not sustain the charge that the board and superintendent have engaged in practices having the effect of suppressing black expressions of opposition to school policies, although that proof does indicate that the defendant school authorities may not have attempted affirmatively to communicate with the black students or their parents, to explain school policies and programs, to provide a forum for the discussion of alleged wrongs, or otherwise to work with the black community as they have with the white community. The Court recognizes that the situation in the Earle Special School District is dramatically different this year than it was in prior years and that there have been innumerable problems which have taken the time, energy and effort of the school officials. The Court finds no reason to believe that the school officials will not, as things "settle down," make the same good faith effort to communicate with the black students and their parents as they do with the whites. The plaintiffs are not entitled to temporary relief upon the basis of the allegations in paragraph VII(B) of the original complaint and the proof submitted in support thereof.

The Court does not find sufficient evidence to warrant a conclusion that the defendant school authorities operated "in concert with" the other defendants (the mayor and the chief of police of Earle and the sheriff of Crittenden County) to make such "school" defendants subject to any of the temporary relief being sought against said other defendants.

Almost all of the black students in the Earle Special School District walked out of school on September 7 in an organized and planned protest against what they felt to be discriminatory practices. Indeed, there is some evidence that these plaintiffs coerced or, at least, pressured certain of their fellow black students into joining the walkout. It is clear, however, that the overwhelming majority of the black students were in sympathy with the walkout and the continuing boycott of the school. This walkout was part of the background for the events which have given rise to the

other complaints of the plaintiffs not relating directly to the "school" problem. The Court hopes to make its decision with respect to the remaining requests for temporary injunctive relief in the near future.

The Court hopes to schedule a final hearing in this case early in November, but it does not feel that a final hearing would be fruitful until the defendant school officials have had an opportunity to operate the schools for at least a month prior to such a hearing with essentially full class attendance. Therefore, counsel for the parties are asked to keep the Court advised as to school attendance so that the Court will be in a position to schedule a final hearing.

## MEMORANDUM OPINION NUMBER TWO

This opinion should be read in the light of, and in connection with, the Memorandum Opinion and the Order entered on October 2, 1970. As pointed out in that first memorandum, the Court decided to take up the various causes of action separately for the limited purpose of acting upon the applications for temporary injunctive relief. That first memorandum and order dealt with the "school" issues. This second memorandum will deal with the "non-school" phase of the preliminary proceeding.

The plaintiffs in the original complaint are black minor children who attended the schools of the Earle Special School District in Earle, Arkansas. They attempt to bring this action not only on their own behalf but on behalf of others "similarly situated," pursuant to Rule 23(a) and (b) 1 (B) of the Federal Rules of Civil Procedure. The defendants in the "non-school" phase of the proceeding are Mr. Jim Browder, Sheriff

of Crittenden County; Mr. James H. King, Mayor of Earle, Arkansas; and Mr. Harold Annis, Chief of Police of Earle.[1]

Paragraph II(B) of the original complaint states:

"This is also a proceeding for a preliminary and permanent injunction to enjoin defendants Browder, King and Annis from imposing curfews against black persons, arresting black persons for demonstrating in support of constitutional rights, from deputizing only white persons, and from engaging in acts with any other persons in which to deny plaintiffs the opportunity to exercise rights guaranteed under the constitution of the United States."

The allegations of the complaint relative to this part of the case are as follows:

## "VIII

"A. On or about August 7, 1970, a large number of black students, including some of the minor plaintiffs, sought to protest the conditions set forth in paragraph VII, supra, by withdrawing from school until the grievances complained about herein were considered and/or redressed by the school board. As a result of this protest, black pupils who withdrew from school for the purpose of peaceful protest were attacked and further provoked by unnamed and unidentified white citizens of and around the city of Earle, Arkansas, some of whom sought to run several of said minor plaintiffs off of the public streets and others of whom brandished and displayed weapons on their person and in their motor vehicles. All of said acts were, on information and belief, intended to counter protest the protest activities of the black pupils and to otherwise

---

1. Subsequent to the hearing on the application for preliminary relief (September 16 and 17, 1970), an amended complaint was filed naming additional parties plaintiff and defendant, including, as plaintiffs, the Rev. and Mrs. Ezra Greer and, as defendants, the members of the City Council of Earle, Arkansas and the City Treasurer-Secretary of the City of Earle. It is not known whether service has been obtained upon the amended complaint. In any event the Court will, as it did in the handling of the "school" case, ignore the amended complaint for the purposes of passing upon the applications for temporary relief.

deprive plaintiffs and members of their class of First and Fourteenth Amendment rights to speech, equal protection, and due process under the law.

"B. Defendants Annis and Browder, although they had knowledge of said "counter protest" activities of said white persons did nothing or took no action to prevent injury or intimidation to and of plaintiffs and their class by said white citizens. Indeed, on or about September 8, 1970, defendants Annis and Browder participated and engaged with said unidentified white persons in said acts of intimidation and suppression by spraying the chemical commonly known as "mace" into the faces of several plaintiffs.

\* \* \* \* \* \*

"D. As a result of said withdrawal from school approximately thirty (30) persons have been arrested and detained as will be more particularly described below.

## "IX

"A. Plaintiffs and members of the class they represent have, since on or about May 21, 1970, attempted to present grievances concerning the schools, housing, employment, and acts of discrimination to school officials and to City of Earle officials.

"B. In connection with the above described presentation of grievances, plaintiffs and members of the class they represent have engaged in peaceful picketing, consumer boycotts, and other constitutional methods of expression.

## "X

"In direct response to the activities described in paragraph VIII above the Mayor and officials of the City of Earle in emergency session, enacted several ordinances designed to inhibit or prevent the exercise of those activities. Those ordinances are more particularly described as follows:

1. *Ordinance No. 1970–3*, An ordinance declaring unlawful and prohibiting unlawful picketing or mass demonstrations and the obstruction of sidewalks and streets in the City of Earle, Arkansas; and for other purposes.

2. *Ordinance No. 1970–4*, An ordinance providing for parade permits in the City of Earle, Arkansas, making of application therefor, providing penalty for violation, declaring an emergency, and for other purposes.

3. *Ordinance No. 1970–5*, An ordinance authorizing the Mayor to declare and enforce curfew and other restrictions in times of threatened riot or widespread breach of the peace and for other purposes.

4. *Ordinance No. 1970–6*, An ordinance declaring unlawful and prohibiting acts of intimidation, obstruction, or coercion as a part of dissent or protest; to declare a penalty therefor, and for other purposes.

## "XI

"A. Since on or about August 5, 1970, defendant King has without notice and absent the requisite requirements of emergency conditions as contained in the above described ordinance No. 1970–5, described in paragraph X above, declared and enforced curfews against blacks only, allowing white persons to be totally free from the restraints of said curfews.

"B. Defendants Annis and Browder, and officers and deputies under their control have enforced various curfew decrees only against black persons and have arrested or sought to arrest only black persons including those with valid reasons for being on the public ways and those immediately adjacent to their own homes. Said curfews and arrests are in retaliation for the exercise of First Amendment rights by plaintiffs.

## "XII

"A. Since on or about August 8, 1970, defendants King, Annis, and Browder have arrested or caused to be arrested in excess of 30 minor black children, included in the class represented by plaintiffs herein, without warrants be-

ing exhibited to said children or their parents for allegedly parading without a permit when they withdrew from school on August 7, 1970, and as described in paragraph VIII above.

"B. Said children were detained by defendants Annis and Browder in excess of 24 hours without informing them or their parents of the nature of the offense or the amount of bond necessary to obtain release from custody.

"C. Defendants King, Annis and Browder have refused to supply information of any kind to parents and representatives of the arrested children and have refused to allow anyone to post necessary bond to secure their release.

"D. Said arrests and detention are in retaliation for protests concerning conditions in the Earle Special School District and are for the purpose of intimidating black persons into abandoning their course of protesting and grieving over conditions in the Earle Special School District.

"E. Defendants King, Annis, and Browder's actions are in concert with those of all other defendants to deny plaintiffs and the class they represent from exercising rights guaranteed under the Constitution of the United States.

"XIII

"A. Defendant Browder has deputized large numbers of white persons, without regard to said persons character or responsibility, in order to form vigilante-like groups in an attempt to intimidate black persons.

"B. Defendants King, Annis, and Browder have threatened plaintiffs with arrest and detention for engaging in activities with protest grievances concerning schools, employment, economic conditions or any other matter.

\*     \*     \*     \*     \*     \*

"WHEREFORE, plaintiffs pray:

"1.   \*   \*   \*

"B. a temporary restraining order restraining defendants King, Annis and Browder, and any and all persons and parties acting in concert with them from intimidating, punishing, or otherwise interfering with plaintiffs and members of their class in their peaceful protest activities by:

1. invoking and enforcing curfews;
2. arresting persons for marching without a permit;
3. arresting persons without warrants;
4. refusing to supply information to persons concerning individuals under arrest;
5. refusing to release detained or arrested persons on recognizance or upon the posting of reasonable bond;
6. deputizing large numbers of white persons.

"2. that the court advance this matter on its docket, set an early hearing and after such hearing:

\*     \*     \*     \*     \*     \*

"B. grant plaintiffs and members of their class mandatory injunctive relief against defendants King, Annis, and Browder, requiring said defendants to equally and impartially enforce the law and when and where necessary provide them police protection from public attacks from white citizens and others who seek to prevent said plaintiffs and their class from the enjoyment of the rights set out herein;"

In addition to the complaint the plaintiffs filed a "Motion for Temporary Restraining Order" on September 14, 1970, the pertinent parts of which are:

"Plaintiffs by their undersigned counsel, respectfully move this Court for a temporary restraining order prohibiting:

\*     \*     \*     \*     \*     \*

"2. defendants King, Annis, and Browder from invoking and enforcing curfews against black persons, from interfering with protest demonstrations by making arrests of demonstrators pursuant to city ordinances concerning parading and picketing, from interfering in any

way with the peaceful petitioning of government by marching, picketing, or demonstrating; from arresting persons without warrants; from deputizing white persons only; for beating or otherwise molesting black persons for engaging in demonstrations.

"In support of their motion plaintiffs would show this Court:

\* \* \* \* \* \*

"3. Plaintiffs have been arrested, jailed, tried and sentenced for violations of city ordinances for engaging in protests against discrimination in the schools. (See newspaper account attached as Exhibit 'A').

"4. Plaintiffs have been shot at, beaten, and otherwise injured by law enforcement officers for engaging in peaceful protest demonstrations.

"WHEREFORE, plaintiffs respectfully pray that this Court:

\* \* \* \* \* \*

"3. Order defendants King, Annis and Browder to cease immediately from (a) enforcing curfews against black persons; (b) interfering with protest demonstrations by making arrests of demonstrators pursuant to city ordinances; (c) interfering in any way with the peaceful petitioning of government by marching, picketing, or demonstrating; (d) arresting persons without warrants; (e) deputizing white persons only; and, (f) beating or otherwise molesting black persons for engaging in demonstrations."

Finally, in their opening statement, immediately prior to the hearing, plaintiffs made it clear that they were challenging the various ordinances referred to in the complaint, on their face and as applied.

The defendants had no opportunity, prior to the hearing on September 16 and 17, 1970, to file any responsive pleadings, nor were they required to do so. It is clear, however, that they vigorously contest this matter and deny that the plaintiffs are entitled to the temporary injunctive relief sought.

Although most of the events which have given rise to this proceeding occurred since May, 1970, other events over the last several years should be mentioned by way of background.

Rev. Ezra Greer, (named as a plaintiff in the amended complaint and one of the principal witnesses at the hearing upon the application for temporary relief), has been active in civil rights work for many years. He is a minister in the Churches of God in Christ and has been active in that church's Department of Evangelism and has also directed the public relations of the church. He was assigned to Alabama in 1960, where he resided in the city of Birmingham. He was active in the now historically famous civil rights confrontations which occurred in Selma and Birmingham.

As a "national evangelist" he conducted revivals in various parts of the country. In 1966 or 1967 he conducted such a revival for approximately ten days in Crittenden County, where it appears he met his wife-to-be. His wife has lived all of her life in Earle, Arkansas. They were married on New Year's Day 1968, and moved to Earle, Arkansas immediately thereafter. Since coming to Earle it is quite clear from the testimony that Rev. Greer has been a prime mover in many efforts to obtain equal rights and equal job opportunities for the blacks of Crittenden County. It is also clear that he is regarded by the majority of the white community as the principal source of all of the "trouble" that has occurred.[2]

The first protest activity which Rev. Greer engaged in after moving to Crittenden County in 1968 had to do with the effort to obtain the removal of the garbage dump from the black section of town. About the same time there was an effort to obtain the integration of the swimming pool. Petitions were signed

---

2. When Mayor King was asked, "If Greer went away, would the problems (at Earle) go away?" he responded, "Yes." The other white defendants and witnesses left the same impression.

and a march was held, and apparently both goals were accomplished.[3]

Between the march mentioned above and the events of the summer of 1970, described below, Rev. Greer participated in and led other peaceful marches through the white areas of town, including certain residential areas. Some included prayer vigils outside of the residences of the mayor and the chief of police.

Soon after he moved to Arkansas, Rev. Greer was active in the organization of the Crittenden County Improvement Association (hereinafter CCIA). At all times pertinent to this proceeding he served as the "Coordinator" of this organization. As the Court understands the testimony, the organization has many members located throughout Crittenden County, including approximately 150 in and around Earle. According to Rev. Greer, the association was formed to help "remedy conditions" not only in Crittenden County but in east central Arkansas. Rev. Greer also testified that both he and the CCIA were dedicated to non-violence. He stated, "I ascribe to the philosophy of non-violence to my death."

In the late spring of 1970, Rev. Greer and certain committees and individual members of the CCIA became interested in the problems of school integration. These people were aware that the school board and HEW had been discussing a plan of integration. Rev. Greer went to Commissioner Arch Ford's office in the state Department of Education in Little Rock and examined what appeared to be the original proposal of the school board. He determined that the original plan had not been acceptable to HEW, but that a substitute plan had been agreed upon. He went to Dallas, Texas, where he talked with Dr. John Bell and received a copy of the plan (Plaintiffs' Exhibit 1— quoted in the memorandum opinion of October 2, 1970). When he returned to Earle he tried to see the superintendent and also to meet with the board of education. Among other things, he felt that the school district was not paying equal salaries to black school personnel compared to whites with the same qualifications.

When school recessed for the summer in May, 1970, Rev. Greer and the "youth league" of the CCIA became concerned about summer employment for the black youth of the area. They talked with certain leaders of the business community. According to Rev. Greer, when they met with no success, they organized a "selective buying campaign" and established picket lines to make it successful.

It appears to the Court from all the testimony that the real friction in the community first arose in connection with these picketing activities in August, 1970. Prior to that time the rest of the community not only tolerated the various protest demonstrations and marches but in some ways actually cooperated. The city police would control the traffic in order to protect the safety of the marchers on those occasions. Furthermore, it appears that in the early stages of the picketing in the summer of 1970 there was no real difficulty. The picketing activity apparently intensified as time went on, culminating in the events of Saturday, August 1, 1970.

There is a conflict in the testimony with respect to the picketing activity on Saturday, August 1, but it appears undisputed that from 15 to 20 young blacks were involved. Rev. Greer maintains that the picketing on that date was essentially orderly; that the pickets walked in a single file, singing. There was other testimony, however, that the pickets were blocking the sidewalks; jaywalking back and forth across the street, interfering with the movement of traffic; were excessively noisy; and blocked ingress and egress from places of business. On that date there were apparently some harsh words between the merchants and

---

3. There remains some controversy as to just how "integrated" the swimming pool is, but apparently this has not been a source of protest since the City's action in 1968.

the pickets, and one or more blacks were taken to the police station but subsequently released without being charged.

In any event, it is clear that the picketing, and the events incident thereto on August 1, were the occasion for the calling of a special meeting of the City Council on Wednesday, August 5, at which the four ordinances, complained of and enumerated in the complaint, were passed, together with the "emergency clause" which would permit them to go into effect immediately.

The first notice that Rev. Greer and the plaintiffs had of the ordinances was obtained from the newspaper report in the Crittenden County Times, published on Thursday, August 6. The defendant sheriff Jim Browder called Rev. Greer and informed him that the sheriff's office had been requested to enforce the ordinances. The sheriff suggested a meeeting, and such a meeting was in fact held on Saturday, August 8. On Friday prior to the meeting, Rev. Greer obtained copies of the ordinances.

The sheriff, chief of police Harold Annis, and mayor James King were present at the meeting on Saturday. According to Rev. Greer's testimony, he questioned the various ordinances. He particularly complained about the "ten-foot" requirement in Ordinance 1970–6, contending that such a requirement made it virtually impossible to picket effectively. He also complained about the parading ordinance, No. 1970–4, emphasizing that, in his opinion, the definition of a "parade" as involving an "assemblage" of fifteen or more persons was unreasonable. He states that he objected to the language in No. 1970–6, Section 1, as a violation of his right of freedom of speech. Rev. Greer also testified that he raised a question about the curfew ordinance and was told that it was one that had been on the books for forty years. A copy of that ordinance was not introduced into evidence, nor was its language quoted in the testimony of any of the parties.

According to Rev. Greer's testimony, the ordinances effectivedly stopped the picketing. There has been no picketing since their enactment.

No arrests have been made pursuant to any ordinance regulating picketing. No curfew has been proclaimed under Ordinance 1970–5, but the defendant city officials continue to enforce the 1940 curfew ordinance, which apparently applies to persons under the age of 18.

Between August 5 and September 7, 1970, it appears that there were no demonstrations or marches involving fifteen or more persons.

On September 7, 1970, as mentioned in the first memorandum, a large majority of the black students at both the senior and junior high schools walked out of those schools at approximately 11:30 a. m. as a planned protest against alleged discrimination in the schools. The junior high grades are located in what used to be the Dunbar High School in the black section of Earle, and the high school grades are located in what used to be the practically all white Earle High School, located in the white section of town. The black students who left the senior high school met those black students from the junior high school at a point approximately halfway between the two. Then all of the blacks proceeded back to the junior high school (old Dunbar High), where many entered the school and attempted to persuade the remaining blacks to join the protest. There is some evidence that a few of the black children remaining in school were coerced into joining those who had walked out. It is also clear that some of the black students engaged in acts of vandalism and also broke approximately six windows in the junior high school. Some of this damage was caused by rocks thrown from the outside into the school building. It appears, fortunately, that no one was physically injured during this episode. When the students left the junior high school a large number of them then proceeded back to the senior high school in the white section of town. This march back to the high school became the basis for the later arrest of ap-

proximately 27 of the students. See below.

According to Sheriff Browder, who witnessed the event, there were approximately 250 black youths in this march back to the high school. When he first observed them they were going west on highway 149, shouting slogans, and blocking about two thirds of the road. He testified that the traffic was not able to move freely. He identified himself on the public address system he had in his automobile and requested these students to break up the march and return to school. They did not but, on the contrary, continued on towards the Earle Senior High School. The sheriff drove on ahead and he and four of his deputies then lined themselves across the street near the high school. At this time he told them again that they could not go on. The group then turned around and marched back down the street and sat for a time under some trees. The sheriff testified that he stayed with the group and that on two occasions coke bottles and rocks were thrown at his car. One rock struck the right front fender of the car. He estimated that the march lasted a couple of hours. There was other evidence as to glass breakage and vandalism along the route of the march, as well as the damage to the junior high school referred to above. Students who participated in the march testified that they did not see any rock- or bottle-throwing from the students, but that objects were thrown at them from a bus. They also testified that a car driven by whites raced by them, seemingly for the purpose of intimidating them, and then crashed into another vehicle at an intersection after passing the marchers. The authorities apprehended those they felt responsible for the collision.

Although it is clear that the white defendants believed or assumed that Rev. Greer was behind the "walkout," he denies that he knew anything about it until after it had occurred. When asked if he had any role in the walkout, he testified, "None whatever." There is no evidence that he had anything to do with the planning of the walkout. After the walkout, however, he asked the black youth to meet with him at the playground in the black community. He stated that his purpose was to find out what had happened and what the students' grievances were.

While the meeting with the students Monday afternoon was going on, Sheriff Browder and Captain Galloway of the Arkansas State Police drove up and gave the crowd five minutes to disperse, according to the testimony of Rev. Greer. There were approximately 100 in the group at the time. The crowd then dispersed as ordered.

Approximately 27 of the young blacks who had walked out of the schools on September 7 were arrested on September 8, 1970, and charged with the violation of Ordinance 1970–4, the "parading without a permit" ordinance. The violation was alleged to be the return trip of the combined group of students from the junior to the senior high school, mentioned above. Bond was set at $500 and only two of the 27 posted same. The remainder were held in the Crittenden County jail at Marion, Arkansas, for two days, until the trial on Thursday, September 10, 1970. Mr. James H. King, as mayor of Earle, presided over the trials. All of the defendants were found guilty of violating the ordinance and were fined $200 and sentenced to three months in jail, with $150 of the fine suspended and the entire jail sentence suspended. All were released after the trial without bond pending either payment of the fine or the filing of an appeal to the Circuit Court.

When Rev. Greer went to the City Hall for the trials on September 10, he testified that there were about twenty state policemen standing around and that there were others, apparently not police officials, "standing around with axe handles and stuff." He testified that some of these people wore blue jeans and white T-shirts and had on "little badges," but he did not know if any of them were actually law enforcement officers or were deputized to act as such. He stated that

they wore helmets of various types, such as those worn by members of the fire department and construction workers.

After the court proceedings on Thursday, September 10, the blacks went to a church in the black area of town to, according to Rev. Greer, "discuss what had happened" and to hear firsthand from the children what had occurred while they were in jail. He testified that the young people then disbanded and the adults agreed to meet again later in the evening, to discuss what they should do "to support the children." According to Rev. Greer, this meeting started between 7:00 and 7:30 p. m. and he was the general chairman. About 300 adults attended. At some point in the proceedings it appears that a pamphlet was circulated which had been prepared by certain "concerned citizens," assumedly black, and signed by another minister. It apparently urged the blacks to send their children back to school. Rev. Greer left the implication that it was an "Uncle Tom" effort and that, when he read it to the people in the church, they just spontaneously got up and walked out of the church toward town to "support their children."

There is much confusion in the testimony as to what transpired after this group of 300 black citizens left the church. It is clear, however, that the group left the church at approximately 10:00 p. m.; that it was composed not only of adults but also of some young persons; and that the group marched from the church in the black section of Earle towards the City Hall in the downtown area. When the group got approximately 150 feet from the City Hall there was a confrontation. It appears that a group of approximately fifteen unidentified white men, some or all of whom were armed, moved in front of the marchers and soon began firing their weapons. The mayor estimated that 150 to 200 rounds were fired. There was immediately chaos as the blacks made an effort to return to the black area.

Rev. Greer testified that he was one of the last to leave the church and that he was catching up with the group when he heard sirens and shooting. He estimated he was approximately in the middle of the group and about a block away from the shooting. He testified that the uniforms of law officers were distinguishable. Someone told him that his wife had been shot. He testified that he found her "stumbling down the street barefooted and bloody." He testified that he picked her up and while carrying her down highway 41 a county sheriff's car first pulled behind him and then pulled in front and stopped. Deputy sheriffs got out of the car and ordered him and his wife into the car. Rev. Greer testified that one of the deputies radioed in, stating, "We got the ones you want." They were taken to the City Hall.

Rev. Greer testified that he asked the officers to call an ambulance because he believed his wife had been shot. He stated that the deputy that brought them in took his stick and pulled his wife's head back, stating that she had not been shot, that she "got this g—d—— stick on her head like you are going to get." Rev. Greer testified that the officer then grabbed him and pushed him to the door and struck him on the back of the head. The following is the testimony of Rev. Greer as to what happened next:

"I was surrounded by state troopers and these little vigilantes or sheriffs * * * and county police. One struck me up beside the head with a Winchester. Said, 'You're a so-and-so preacher, nigger, let me hear you preach,' I threw my hands up, said 'Oh my God,' and he hit me in the ribs with the Winchester, said 'Preach, nigger, let me hear you preach.' The other one struck at me and I threw my hand up this way and he hit me across this wrist. I fell back some and a state trooper hit me across my back and said, 'Get your so-and-so back in there—don't back up here.' When I fell back another one hit me with something like a chain across this and this hand. Then I heard Mayor King say, 'Don't knock him uncon-

scious. That's enough.' They sprayed me in the face with mace and took me into the cell."

Rev. Greer stated that he did nothing to provoke the attack and that no police officer did anything to protect him. His left arm was broken and his head wound required stitches and there were bruises about his arms and body.

Sheriff Browder testified that he was in his car on his way back to Earle when he heard of the confrontation and shooting. He stated that when he drove up he saw a group of people outside of City Hall and that it "looked like a fight was going on." He jumped out of his car and headed towards the group, but by the time he arrived the fight "broke up." He stated that Rev. Greer was leaning back on an automobile and another man was directly in front of him and about nine or ten whites surrounded them. He testified that Mayor King ran out of the police department as he, the sheriff, arrived, saying, "We will not have any of this." They then escorted Rev. Greer back into the City Hall. The sheriff testified that he did not see any state troopers but did see two of his deputies, but does not recall who they were.

The sheriff's testimony accords with that of Mayor King. The mayor was in his office when an alderman, Billy Rogers, came in and stated, "If you don't get out there they will kill Greer." The mayor states that when he went out, there were white civilians surrounding Greer but no uniformed personnel. He states that no one struck Greer after he got there.

Mrs. Greer testified that she was in the crowd of some 250 to 300 black people when they proceeded toward City Hall on the night of the 10th of September. She stated there were quite a few people in front of her and that when the crowd stopped, she stopped. She stated that she moved over to try to see to the front of the group and that she saw officers in uniforms, particularly blue and gray uniforms. She stated that she saw state policemen and local policemen shooting firearms and that, as she ran,

she was attacked by a state trooper and kicked by him. She testified that she was then helped by two men and that she went down an alley where she met her husband, who then carried her until they were picked up by county officers. She stated that she could see blue uniforms when her husband was dragged out of the City Hall. Mrs. Greer further testified that she could not recognize the person who attacked her.

Mrs. Greer is a candidate for mayor of the city of Earle in the forthcoming election and Rev. Greer is a candidate for alderman for ward 3, position 1.

The deputy sheriffs who brought in Rev. and Mrs. Greer on the night of September 10 testified at the hearing. It is clear from their testimony that they had placed Rev. Greer under arrest promptly after they picked him up. Therefore, although there is much confusion in the testimony as to what actually transpired after they brought the Greers to the City Hall, there is no question but that the Greers were in the custody of the law and that Rev. Greer was under arrest at the time that he was beaten.

As stated above, Rev. Greer was not a plaintiff in the proceeding as originally filed. He testified as a witness in support of the allegations made by the plaintiffs.

Although it is not clear from the testimony who the persons were who actually participated in the cowardly attack upon Rev. Greer, and although it is open to question whether law enforcement officers of the state, county or city participated in the attack or stood by, it is certainly clear that, being prisoners and in the custody of the law, the Greers were entitled to be protected from any attack. Good, professional, lawmen take it as a badge of honor that they can and will do anything necessary to protect persons in their custody, even if they personally despise such persons. Although the Court can deplore such violence, the evidence thereof is germane here only insofar as it supports the plaintiffs' application for temporary in-

junctive relief. The same may be said with respect to the "violence" of the students involved in the activities on September 7: the throwing of rocks and bottles, the breakage of windows, etc. This activity should be, and is, also deplored, but its relevance to this proceeding is also limited to its use as a justification for certain police action, including the arrests of the students, and also for the need for, and background of, the ordinances discussed below.

The Court believes the testimony of Sheriff Browder and Mayor King with respect to their actions in attempting to rescue and protect Rev. Greer when he was being violently attacked outside of City Hall on the night of September 10. However, the responsibility, if any, of the "non-school" defendants in this proceeding for the actions of their subordinates is a matter which can best be left for determination at the trial on the merits. The relevance of such matters to the cause of action here asserted and the relief sought can also best be determined at that hearing in the light of the state of the pleadings at that time.

In addition to the factual narrative above and the discussion of the evidence, the Court makes the following specific findings with reference to the particular factual allegations in plaintiffs' Complaint:

A. The Court has already discussed the walkout which occurred on September 7, 1970 (not August 7, 1970, as stated in paragraph VIII(A) of the complaint). There was no showing that any "unidentified, white citizens" acting in concert with law enforcement officials attacked or provoked the children. There was evidence that a bottle was thrown at the children from a bus and that an automobile drove past the students at a high rate of speed. The actions of unidentified, or identified, private citizens (not in concert with state officials) can not form the basis for the relief here sought.

B. The allegations of paragraph VIII (B) were not sustained by the evidence.

(Note: The pertinent allegations of the Complaint referred to here and in the following subparagraphs are quoted above in this memorandum.)

C. The proof does not sustain the allegation in paragraph VIII(D) that the arrests of some thirty students were "as a result of (their) withdrawal from school."

D. The evidence does sustain the allegations in paragraph IX(A) and (B).

E. The proof establishes the enactment of the ordinances referred to in paragraph X.

F. The proof does not establish the allegations of paragraph XI(A) or XI (B).

G. The proof does not establish the allegations of paragraph XII(A) insofar as it states that said arrests were "without warrants being exhibited to said children or their parents."

H. The proof does not establish the allegations of paragraph XII(B) or XII (C) except that it is admitted that the children were detained in excess of 24 hours.

I. The proof is not clear as to the exact motives of all of the public officials involved with respect to the arrests. Furthermore, there is a question in the Court's mind as to the relevancy of such motives. This legal issue should be resolved before the final hearing on the merits.

J. The proof did not establish concerted action between the "school" defendants on the one hand and the "law enforcement" defendants on the other hand.

K. The proof did not establish the allegations of paragraph XIII(A).

L. The proof did not establish the factual allegations of paragraph XIII (B), although it does appear that certain of the defendants warned the witness, Rev. Greer, and others that they would enforce the provisions of the law and of the ordinances enacted on August 5, 1970.

■ The Court concludes that the plaintiffs are not entitled to a temporary restraining order restraining the defendants, Mayor King, Chief of Police Annis, and Sheriff Browder from:

"1.  invoking and enforcing curfews;

2.  *  *  *

3.  arresting persons without warrants;

4.  refusing to supply information to persons concerning individuals under arrest;

5.  refusing to release detained or arrested persons on recognizance or upon the posting of reasonable bond;"

or

"6.  deputizing large numbers of white persons,"

as prayed in the original complaint.

The Court reserves its ruling upon the application of both the old and the new curfew ordinances until final hearing on the merits.

The evidence did not sustain the allegation that the defendants were "arresting persons without warrants." Nor does it sustain the allegations that the defendants refused to supply information concerning those under arrest or refused to release detained persons upon the posting of reasonable bonds.

With respect to the allegations concerning the "deputizing (of) large numbers of white persons," the great weight of the evidence indicates that Mayor King deputized about twenty persons around 11:15 p. m. on the evening of September 10 after all of the violence, including the assault upon Rev. Greer, had transpired. These men were posted along the railroad track to protect city property. At approximately 12:00 p. m., at the suggestion of the state police, authority was withdrawn from these persons by the mayor and they were sent home.

The plaintiffs have also put in question the constitutionality of the four ordinances referred to above. They are in effect seeking declaratory and injunctive relief, i. e., they seek a declaration of this Court that each of said ordinances is unconstitutional on its face or unconstitutional as applied, and also injunctive relief prohibiting defendants from utilizing and enforcing said ordinances.

■ The ordinances individually, and as a "package", give great concern to the Court, although the first "picketing" ordinance, No. 1970–3, and the "curfew" ordinance, No. 1970–5, taken alone and separately, appear to be valid exercises of state power and authority. Ordinance No. 1970–4, the "parade regulation," and Ordinance 1970–6, the second "picketing" ordinance, would not seem to accord with constitutional standards set forth by the courts, including the United States Supreme Court.

Ordinance No. 1970–6 provides:

"SECTION 1:  Any person who shall, while engaged in otherwise constitutionally protected picketing, make any abusive, violent, or threatening statement, utter any obscene, profane, or intimidating language, carry or display any slanderous, libelous, or obscene sign, obstruct or coerce any picketed employer, employee, customer, or supplier, engage in any physical contact with any such employer, employee, customer, or supplier, or their vehicle, or picket within ten (10) feet of the entrance of such place of business, obstruct the street or sidewalk in such manner as to inhibit the normal flow of traffic thereon, or engage in any violent or wilfully tortious boycott in restraint of trade, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not more than Five Hundred Dollars ($500) or be imprisoned in the County Jail not more than six (6) months, or both such fine and imprisonment."

The testimony makes it quite clear that this ordinance would make "effective communication" by peaceful picketing practically impossible. It appears uncontested that the width of the sidewalks

at Earle is less than ten feet, and that when one moves laterally on a sidewalk for a distance of ten feet from the entrance of a place of business, he is likely to be within ten feet of the entrance to the adjacent place of business. It matters not that there may be some small area on the sidewalks that might be available for picketing under the terms of the ordinance. It is clear that the restriction is unreasonable. The ordinance also contains prior restraints upon the exercise of free speech by making it a violation, while engaged in picketing, to make "abusive" statements or utter any "intimidating language" or to "carry or display any slanderous (sic) (or) libelous * * * sign" or to "engage in any * * * wilfully tortious boycott in restraint of trade." Ordinance No. 1970–6 must also be interpreted in the light of Ordinance No. 1970–3, which prohibits picketing or mass demonstrations "in such a manner as to obstruct or unreasonably interfere with free ingress or egress from any public or private premises * * * or so as to obstruct or unreasonably interfere with free use of public streets, sidewalks, or other public ways * * *" Since there was no showing in the preliminary hearing that Ordinance No. 1970–3 is unconstitutional on its face or as applied, it will be permitted to stand pending any further showing which the plaintiffs might make with respect thereto at the final hearing. It is, therefore, difficult to see how any legitimate objective served by Ordinance No. 1970–6 is not equally served by Ordinance No. 1970–3.

Some of the defendants have testified that they need all of these ordinances to maintain law and order in Earle, Arkansas. Without them they were of the opinion that law enforcement would have to be turned over to the National Guard. The evidence is clear that it does not take much time to enact "emergency" ordinances. The Court hereby declares its intention to hold Ordinance No. 1970–6 unconstitutional on its face and as applied within one week from the entry of this memorandum opinion #2, unless the defendants make a further showing within that period by affidavits or otherwise, which convinces the Court that such a declaration of unconstitutionality would be in error under the facts and the law, the latter being discussed below. In the meantime, however, there is no restriction upon the power and authority of the mayor or City Council to enact any and all lawful and constitutional ordinances which they feel necessary to protect the public peace within their jurisdiction.

The definition of "parade" in Ordinance No. 1970–4 as "an assemblage of more than 15 persons on the streets and public ways * * * or the movement of such persons as a body for a common purpose * * *" gives the Court great difficulty. It is obvious that such ordinance refers not only to a parade in the ordinary sense but to any public assembly. The Court is tentatively of the opinion that Ordinance No. 1970–4 is unconstitutional on its face, but, because it still has doubts on the question, this tentative conclusion will not be used as the basis for declaratory or injunctive relief prior to the hearing on the merits. Suffice it to advise the parties of the Court's attitude towards the ordinance in the light of the law, discussed below.

The case of Davis v. Francois, 395 F. 2d 730 (5 Cir., 1968), involved issues similar to those facing this Court with respect to the constitutionality of the ordinances referred to above. The appeal in that case was from an order dismissing plaintiff's suit for declaratory and injunctive relief against a picketing ordinance enacted by the City of Port Allen, Louisiana. The plaintiffs had asked the District Court to enter a declaratory judgment and a temporary restraining order and a preliminary and permanent injunction against the enforcement of the ordinance, which provided that it would be unlawful for more than two persons to picket on the streets or sidewalks of the city in front of a residence, a place of business, or a public building. The two pickets permitted

were required to stay five feet apart at all times and not obstruct the entrance of any residence, place of business, or public building. The plaintiffs alleged that the ordinance had a "chilling effect" on their First Amendment rights and that it violated both the First and Fourteenth Amendments of the United States Constitution. The lower, district court invoked the doctrine of abstention remarking, however, that the ordinance was "not unconstitutional on its face." The Fifth Circuit, without dissent, reversed and remanded. Judge Thornberry ably discusses and cites the pertinent decisions. That discussion need not be repeated in this memorandum opinion. Suffice it to say here that the Fifth Circuit, in the *Davis* case, emphasized that their holding did not mean that cities are powerless to regulate demonstrations. It simply required that cities identify a substantial interest worthy of protection and draft their ordinances carefully so as not to exceed the legitimate objective. The Court stated:

> "The decisions indicate that this process has been accomplished in at least two ways. First, the state by a narrowly drawn statute may regulate the time, place and manner of the demonstrations. Unless the building is a sensitive facility that may be made totally off limits to public debate, the right to demonstrate on public property should only be regulated by statutes that consider all of the nuances of the time, place and manner. Second, it is clear that the state may enact an ordinance that carves out of the demonstration the evil it seeks to prohibit and thereby isolates conduct that does not have first-amendment protection."

The Court cited Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) as illustrative of this reasoning. The Court concluded:

> "Only by requiring these narrowly drawn and precise enactments that aim at specific conduct can courts produce a reasonable reconciliation of the minority's right to protest, and the majority's right to peace and order. Unit-

ed States v. Aarons, 2d Cir. 1962, 310 F.2d 341, 345. Since first-amendment rights are the essence of any free society, there can be no doubt that courts are justified in seeking this accommodation of liberty within the public order.

> These [First Amendment] rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their Legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.

> "DeJonge v. State of Oregon, 1931, 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L. Ed. 278, 279."

Since the Court is not granting any temporary relief with respect to the "marching" ordinance at this time (although it has expressed a tentative opinion that same is unconstitutional), the parties will have a further opportunity at the hearing on the merits to introduce additional evidence, if any, relevant to this issue, and the opportunity to bring to the Court's attention additional authorities which they feel are relevant.

This case should be disposed of on its merits as soon as possible. The parties should advise the Court when service has been completed and issue joined on the amended pleadings and the matter ripe for trial.

Counsel for the parties to this "non-school" phase of the case should advise the Court by letter not later than November 15, 1970, as to the status of the case; their attitude as to the possible severance of the "school" and "non-school" causes; and the factual issues with respect to which they intend to put on additional evidence at the trial on the merits.